# Richmond

## S. L. NUSBAUM AND COMPANY, INCORPORATED v. ATLANTIC VIRGINIA REALTY CORPORATION.

January 17, 1966.

Record No. 6033.

Present, All the Justices.

*Robert C. Nusbaum* and *Alan J. Hofheimer* (*Hofheimer, Nusbaum & McPhaul*, on brief), for the plaintiff in error.

*Joseph A. Gawrys* (*Braden Vandeventer, Jr.; Vandeventer, Black, Meredith & Martin*, on brief), for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

On February 1, 1963, S. L. Nusbaum and Company, Incorporated [Nusbaum], a real estate broker, filed this motion for judgment against Atlantic Virginia Realty Corporation [Atlantic Realty] and Virginia Dare Stores Corporation [Virginia Dare], seeking the recovery of $28,080.00. Nusbaum alleged that, as agent for Anjo Corporation [Anjo] it had interested Virginia Dare in leasing certain land of Anjo and a building to be erected thereon; that as a result of negotiations between the parties a lease, dated April 27, 1959, was entered into between Anjo and Atlantic Mills Thrift Center of Norfolk, Incorporated [Atlantic Mills], a wholly owned subsidiary of Virginia Dare; that its compensation for procuring the lease and collecting the rent therefrom was fixed at 6% of all rent payable under the lease; that Atlantic Realty subsequently purchased the demised property,. expressly subject to the above mentioned lease and the obligation of Anjo to compensate the plaintiff as aforesaid; and that Atlantic Realty and Virginia Dare had refused to pay any commission on rent accruing after August 21, 1962.

Atlantic Realty demurred to the motion on the ground that it did not set forth a cause of action. After considering the pleadings and exhibits introduced by the parties, the court sustained the demurrer, with leave to Nusbaum to amend its pleadings. Nusbaum filed an amended motion, in which it alleged that its compensation for procuring the lease was "orally" fixed by it and Anjo at 6% of all rent payable thereunder, "as and when the rent was paid;" that the agreement conferred upon it "a vested interest in 6% of all rents" and "an equitable assignment" of the rents to secure (to Nusbaum) its

said compensation; that Anjo had thus "divested itself of 6% of future rent payable, and could not convey to any grantee more than 94% of such rent;" that Virginia Dare, the parent corporation, guaranteed the lease; that Anjo, by letter dated May 3, 1960, expressly confirmed its right to collect the rent throughout the term of the lease; that pursuant to said agreement, it was "paid each month a commission of $260.00 by Anjo, and later by Independence Bus Corporation [I. B. C.], a successor in title to Anjo, for all rents paid under said lease up to and including August 31, 1962;" that in August, 1962, the property demised in the lease was conveyed to Atlantic Realty by I. B. C., expressly subject to the lease, and that although Atlantic Realty knew that the rent payable under the lease was charged with its [Nusbaum's] commission rights, Atlantic Realty had refused to pay any of said commission.

Atlantic Realty demurred to the amended motion and the demurrer was overruled. It thereupon filed an answer specifically denying that it was obligated to Nusbaum in any manner or for any sum whatsoever. On motion of Nusbaum, the court entered a nonsuit as to Virginia Dare.

The case came on to be heard by the court, without a jury, and after considering the pleadings, the evidence, including the exhibits, and the argument of counsel, judgment was entered for Atlantic Realty and the proceeding dismissed with prejudice. This appeal followed.

The record reveals the following chain of events:

Early in 1959, Nusbaum wrote to Virginia Dare, a Delaware corporation, and informed it that there were several suitable locations in the Norfolk area for building a discount store. Representatives from Virginia Dare became interested in the property of Anjo, and Nusbaum introduced them to L. T. Zoby, president and sole stockholder of Anjo. On April 27, 1959, Anjo executed a written lease demising its property to Atlantic Mills, subsidiary of Virginia Dare, for a term of twelve years, beginning September 1, 1959, at an annual rental of $52,000.00, payable at the rate of $4,333.13 per month. Nothing is said in the lease as to the collection of the rent by Nusbaum, or the payment of any compensation to it for procuring the lessee. The name of Nusbaum appears only twice. In its first paragraph, it is recited that the lease was made and entered into "by and between ANJO CORP., c/o S. L. Nussbaum & Company, Agents, of Norfolk, Virginia (hereinafter called the 'Lessor')."

Paragraph 19 provides that: "Any and all notices required to be given pursuant to this lease should be sent by registered or certified mail to the Lessors at c/o S. L. Nussbaum & Company, Norfolk, Virginia and the Lessee at 111 Eighth Avenue, New York, New York. Either party shall notify the other in writing to specify a new or different address to which notices should be sent."

Anjo promptly constructed a building on the demised property, and delivered possession to Atlantic Mills on September 1, 1959. Atlantic Mills forwarded its monthly check in payment of the rent to Nusbaum, the agent of Anjo. Nusbaum deducted 6% therefrom for its commission, and remitted the balance to Anjo.

Nusbaum, realizing that there was no written agreement as to its compensation, requested a written commitment from Anjo, setting out certain conditions. In response Anjo, disregarding the requested conditions, sent the following letter to Nusbaum, dated May 3, 1960:

"Re: Anjo Corporation lease to Atlantic Mills Thrift Center of Norfolk, Incorporated
Date of lease: April 27, 1959
Premises: Sewells Point and E. Little Creek Roads, City of Norfolk, Virginia

"Dear Sirs:

"This letter contains the covenant and agreement of the undersigned to pay you, for services heretofore rendered by you in procuring the above mentioned lease, regular commissions at the minimum (6%) rate prescribed by the Norfolk Real Estate Board, Incorporated, in respect to all rent payable on the said lease and any extensions or renewals thereof.

"It is understood that you will, without additional charge, use your best efforts to collect rent payable under the lease, after deducting your commission, and any other authorized items, remit the balance regularly to the undersigned. Nothing herein obligates you to furnish legal counsel or institute legal proceedings in order to collect rent; however, the collection of rent by you is an express condition of the payment of money set forth herein.

"Signed and sealed this 3rd day of May, 1960.

"ANJO CORPORATION
"By L. T. Zoby
"President."

Nusbaum received the letter, made no objection, and continued to

collect the rent. L. T. Zoby, author and signer of the letter, testified that he had a "standing deal in town [Norfolk, Virginia] with all the real estate agents" that if they would bring him a tenant that he liked they would be authorized to collect the rent and receive "6% in the deal."

On September 15, 1959, Anjo conveyed the demised property to trustees to secure the payment of $350,000.00 to the Home Beneficial Life Insurance Company, Incorporated. The deed also granted and transferred as additional security for the loan all the right, title and interest of Anjo in the lease dated April 27, 1959, with the agreement that, in the event of default under the deed of trust, or the payment of the obligation secured thereby, the holder of the obligation should have the right to collect the rents.

It appears that Zoby had pledged his stock in Anjo Corporation to the First National Bank of Boston as security for a loan made by that bank to one of his corporations, the Towers Shopping Center in Roanoke, Virginia. Upon default in payment of that loan, the bank agreed that if Anjo would convey to it the property leased to Atlantic Mills, the bank would release the Anjo stock to Zoby. On February 26, 1962, the property was conveyed with general warranty by Anjo to I. B. C., a corporation wholly owned by the bank and organized to receive the conveyance. No mention of Nusbaum was made in the deed, but the conveyance was made "expressly subject to the lease of April 27, 1959," the deed of trust from Anjo securing the Home Beneficial Life Insurance Company, Incorporated, and another deed of trust from Anjo to Frank W. Rogers and John W. Walker, trustees, dated November 21, 1961. No mention was made of Nusbaum in the deed. Subsequent to the conveyance to I. B. C., Nusbaum collected the rents from Atlantic Mills, and made a report to I. B. C. until it sold and conveyed the property.

The First National Bank of Boston acquired the property in the name of I. B. C., with the view to selling it within a short time. On June 21, 1962, I. B. C. entered into a contract to sell the property to 10 Barrow Street Corporation [Barrow]. The contract stated that the sale was to be made subject to the lease held by Atlantic Mills and "further subject to the management contract of L. S. Nusbaum and Co., Inc., as well as the deed of trust securing the Home Beneficial Life Insurance Company, Incorporated." On July 18, 1962, Barrow assigned the contract to Gibraltar Management Company, Incorporated, and on August 13, 1962, Gibraltar assigned

it to Atlantic Realty. No mention is made of Nusbaum in either assignment.

In the meantime, on August 1, 1962, the property leased to Atlantic Mills was conveyed by deed of I. B. C., with general warranty, to Atlantic Realty. The deed contained the recital that the conveyance was made "expressly subject to a lease from Anjo Corp., c/o S. L. Nusbaum & Company, Inc., Agents" and Atlantic Mills. No other mention was made of Nusbaum.

On August 31, 1962, Atlantic Realty, the owner of the land, and Atlantic Mills, the tenant thereof, entered into an agreement cancelling the lease of April 27, 1959. On the following day they entered into a new lease, which provided for rent in an increased amount for a longer term, and to be paid directly to the lessor. No mention of Nusbaum appears in the new lease.

Nusbaum argues that its compensation "was fully earned by obtaining a satisfactory tenant, though due and payable only as the rent was payable;" that it "was given an equitable assignment of the rents to secure to plaintiff its said compensation;" that it "was not obligated to render any other service and had no management duties, the rent collection being undertaken by Nusbaum for its own security and not as a service to the landlord;" that the purchase of the property by Atlantic Realty was "expressly subject to its vested commission rights in the future rent installments;" and that since Anjo "assigned and transferred 6% on all future rents to it before sale of the property to I. B. C., and resale to the defendant, Atlantic Realty, consequently, Atlantic Realty never acquired more than 94% of the rents receivable under the lease." It disclaims any power coupled with an interest.

On the other hand, Atlantic Realty asserts that the agreement of Anjo to pay Nusbaum a commission on rents collected was only a personal obligation of Anjo; that Nusbaum acquired no vested interest in the rent thereof; that there was no assignment, equitable or otherwise, of the rent; and that neither I. B. C. nor Atlantic Realty ever agreed, in writing or otherwise, to assume the obligations of Anjo, or of anyone else, to Nusbaum.

We agree with the trial court that the evidence failed to show that Nusbaum was given either a vested interest in the demised property or the rentals therefrom, or that there was an equitable assignment to it of a percentage of the rent. The brokerage contract of May 3, 1960, is clear, simple and free of ambiguity. In determin-

ing its meaning, we must ascertain the intention of the parties from the language used. At most, it authorized Nusbaum as the agent of Anjo to collect the rent. The right of a real estate broker to commissions is a matter of contract, either express or implied. Here, the duties and right of the broker were express and definite. Its sole duty was to use its best efforts to collect the rent, and for such service it had the right to retain 6% of the amount collected as compensation for such collection and services theretofore rendered.

Nusbaum did not claim a vested interest until its amended motion was filed. There is no evidence to show that Atlantic Realty, or its predecessor in title, ever assumed any obligation to Nusbaum. The 1959 lease did not confer upon Nusbaum any authority to collect the rents, or any interest in or right to any portion of them. The references to the lease, in the contracts and deeds, were simply notice of the existence of the lease. The 1960 brokerage agreement between Anjo and Nusbaum was solely for brokerage fees computed on a percentage of the rent collected by Nusbaum.

There was no privity of contract between Nusbaum and Atlantic Realty. Nusbaum was not a party to any of the written instruments, save the brokerage agreement of May 3, 1960. There is nothing in that agreement, or in the contracts and deeds in evidence, to show that the leasehold property or the rent therefrom, should stand as security for the payment of the broker's commission. Had it been intended that the broker's commission should be a lien on the demised property, it is unlikely that so important a provision would have been omitted from that agreement. *Hoffman* v. *First National Bank of Boston,* 205 Va. 232, 238, 135 S. E. 2d 818.

The courts have frequently construed the words "subject to." They are words of qualification and notice and not words of assumption.

In *S. T. McKnight* v. *Central Hanover Bank & Trust Co.*, 120 F. 2d 310, 320, (8 C. C. A.), this is said:

"That the words 'subject to all the terms and conditions of said lease,' do not impose contractual liability on an assignee under a lease to carry out the covenants of a lease seems to be the well supported rule."

In 83 C. J. S., Subject, page 555, the expression "subject to" is defined as follows:

"It normally connotes, in legal usage, an absence of personal obligation, and as ordinarily used does not create affirmative rights."

*Helvering* v. *Southwest Consol. Corporation*, 62 S. Ct. 546, 551, 315 U. S. 194, 86 L. ed. 789; *Shell Oil Co.* v. *Manley Oil Corporation*, 124 F. 2d 714, 716.

The April 27, 1959 lease simply refers to Nusbaum as an agent of Anjo, and to the address at which Anjo could be reached. The words "subject to the lease" in the deed of Anjo to I. B. C. were only a reference to the existence of the lease and not to the right of Nusbaum in the collection of rents. In the contract of sale between I. B. C. and Barrow, the statement that the sale was to be "subject to the management contract of Nusbaum" is of no significance since Nusbaum disclaims any "management contract." In the deed from I. B. C. to Virginia Realty, the words "subject to the lease from Anjo to Atlantic Mills" refer only to the lease, and not to any rights of Nusbaum.

The obligation of Anjo, the landlord, to Nusbaum was personal, and there is no rule of law which required a subsequent grantee of Anjo to assume the personal obligation of Anjo, in the absence of an agreement to the contrary. *Solis-Cohen* v. *Phoenix Mutual Life Insurance Co.* [1964] 413 Pa. 633, 198 A. 2d 554.

In *Burton* v. *Chesapeake Box, etc., Corp.*, 190 Va. 755, 57 S. E. 2d 904, we held that where a lease containing a covenant of the lessee to maintain fire insurance on the property was assigned and the instrument was not signed by the assignees, that the latter did not assume the obligation to obtain the fire insurance against a fire that subsequently occurred. "The situation is analogous to the conveyance of real property, subject to a deed of trust or other lien, where the grantee does not incur personal liability for the payment of a lien unless he agrees to assume such payment." 190 Va., *supra*, at page 767.

The brokerage contract of May 3, 1960, embodied the source of the rights and authority of Nusbaum. There is in it no indication that those rights would be absolute and irrevocable; in fact, it said that "the collection of rent by you is an express condition of the payment of money set forth herein." It was nothing more than a personal agreement of Anjo to pay Nusbaum for services rendered, and to be rendered, a fee out of money collected by the latter.

In *Hicks* v. *Roanoke Brick Co.*, 94 Va. 741, 745, 27 S. E. 596, 598, we said:

"But a mere promise or agreement to pay a debt out of a designated fund, when received, does not give an equitable lien upon the fund,

nor operate as an equitable assignment of it." Cf. *Lone Star Cement Corp.* v. *Swartwout*, 93 F. 2d 767, 4 C. C. A.; *Christmas* v. *Russell*, 14 Wall. (81 U. S.) 69, 20 L. ed. 762; *B. Kuppenheimer & Co.* v. *Mornin*, 78 F. 2d 261, 8 C. C. A.

It is well settled in this jurisdiction that since equity disregards mere form, no particular words or acts are necessary to effect an equitable assignment. The intention of the assignor is the controlling consideration. The intent to transfer a present ownership of the subject matter of the assignment to the assignee must be manifested by some word, written or oral, or by some act inconsistent with the assignor's remaining as owner. This has sometimes been called a "present appropriation." The assignor must not retain any control over the fund or property assigned, any authority to collect, or any form of revocation. See *Switzer* v. *Noffsinger*, 82 Va. 518; *Chesapeake Classified Building Association* v. *Coleman & Others*, 94 Va. 433, 26 S. E. 843; *Rinehart & Dennis Co.* v. *McArthur*, 123 Va. 556, 96 S. E. 829; *Virginia Machinery & Well Co.* v. *Hungerford Coal Co.*, 182 Va. 550, 29 S. E. 2d 359; 6 Am. Jur., 2d, Assignments, § 83; and 2 M. J., Assignments, § 19.

In 6 C. J. S., Assignments, § 58, pages 1102 and 1103, this is said:

"Where the transaction is evidenced by a written agreement or stipulation in writing, it depends upon the intention of the parties *as manifested in the writing*, construed in the light of such extrinsic circumstances as, under the general rules of law, are admissible in aid of the interpretation of written instruments." [Emphasis added.]

The fact that Nusbaum was given the right to withhold brokerage fees from its collections of rent constituted merely a security arrangement for the payment of its earned compensation. *Hastings* v. *Continental Food Sales, Inc.*, 60 Wash. 2d 820, 376 P. 2d 436, *Hoffman* v. *First National Bank of Boston*, supra, 205 Va., page 237. A real estate broker is not entitled to a lien or charge against land, or the rent to be collected therefrom, where there has been no agreement for a lien or charge on the land, or on the rent, for his benefit. There is a material difference between an agreement, whereby the broker shall receive a share of the purchase or rental money, and an agreement merely that he shall receive a commission out of rent, when and if it is collected. The latter agreement affords no basis for an equitable lien upon uncollected rentals.

We have examined the cases cited by Nusbaum in support of its contention. They may be readily differentiated on the facts from

those here under review. Here, there was a mere promise of Anjo to pay Nusbaum a fee for collecting money due and owing to Anjo. The only assignment by Anjo of any nature or character, shown by the record, was its conditional assignment of the rent to secure the loan of the Home Beneficial Life Insurance Company, and that assignment was made prior to the brokerage contract of May 3, 1960.

We find no error in the ruling of the trial court. Its judgment is affirmed.

*Affirmed.*