ROCK CREEK GINGER ALE COM-
PANY, INC., Plaintiff,

v.

THERMICE CORPORATION, Defendant
and Third-Party Plaintiff,

v.

F & M SCHAEFER BREWING COM-
PANY, Third-Party Defendant.

Civ. A. No. 137–70.

United States District Court,
District of Columbia.

June 28, 1971.

Nathan L. Silberberg, Washington, D. C., for plaintiff.

E. Gwinn Miller, Rockville, Md., for defendant and third-party plaintiff.

Alan Raywid, Washington, D. C., for third-party defendant.

## MEMORANDUM

GASCH, District Judge.

This matter came on for trial before the Court. Plaintiff, a Delaware corporation doing business in the District of Columbia as the Rock Creek Ginger Ale Company, sued defendant Thermice, a Pennsylvania corporation having its principal office in Philadelphia, Pennsylvania, and doing business in a substantial number of states, including the District of Columbia, for breach of contract, negligence, and breach of warranty, express and implied. Thereafter, defendant Thermice, as third-party plaintiff, filed a third-party action against the F & M Schaefer Brewing Company, a New York corporation, alleging breach of warranty, express and implied, contending that if Thermice is held responsible for damages to plaintiff, the third-party defendant would be liable to it in whole or in part.

From the testimony adduced in open Court, exhibits received in evidence, and the admissions of defendant Thermice, the Court finds the following facts:

Plaintiff, a manufacturer of soft drinks, has its principal place of business in the District of Columbia. For a number of years prior to the incident in question, plaintiff had purchased carbon dioxide from defendant Thermice, which product was delivered to plaintiff by defendant Thermice in its special tractor-trailer tank and more specifically, from such tank to a specially designed storage tank on plaintiff's premises, which storage tank is owned and serviced by defendant Thermice under a lease agreement with plaintiff.

On or about July 31, 1969, defendant Thermice's driver, one Kenyon, delivered approximately 20,000 pounds of liquid carbon dioxide to the storage tank on plaintiff's premises heretofore mentioned. This quantity of carbon dioxide had been purchased by Thermice from the F & M Schaefer Brewing Company at its Baltimore, Maryland, plant.

During the week following the delivery in question, various employees of plaintiff noticed an unusual odor in and about the portion of the plant used for bottling carbonated beverages. A sales representative of plaintiff was informed by some of his customers that some of plaintiff's product contained an unusual odor. Plaintiff's employees made their usual sniff and taste tests on the production lines without noticeable results. Plaintiff submitted samples of the various ingredients utilized in the production of its product as well as samples of its products to the laboratory maintained by the National Association of Soft Drink Manufacturers in an effort to ascertain the cause of the unusual odor. The odor was described by several of plaintiff's witnesses as being similar to that caused by rotten eggs.

One of plaintiff's employees, one Carrick, whose job at this time was the supervision of bottling operations of plaintiff, having been unsuccessful in his efforts to locate the source of the odor in the bottling plant, checked the main storage tank which was owned, installed, maintained, and leased by Thermice to plaintiff and to which the carbon dioxide was delivered on the 31st of July, and ascertained upon opening the valve thereof that a strong rotten egg odor emanated from the tank. He brought this to the attention of plaintiff's officials who thereupon shut down bottling operations and transmitted to Thermice this information. On or about August 8, 1969, the Thermice truck driver Kenyon, who had made delivery of the tank of carbon dioxide in question, returned with his truck to plaintiff's plant, checked the valve in question, noted a smell which he described as bad, smelling pretty rank and similar to that of a dirty bar rag. Thereupon he pumped out the tank and delivered the contents thereof to an industrial user of the product, the Armstrong Cork Company. After the tank had been pumped out and blown down by Kenyon, another employee, one Craig, supervised the cleansing of the tank by Rock Creek's employees.

To the extent possible, generally by the use of dates of bottling stamped on the cases, plaintiff sought to segregate those cases of its bottled products which had been manufactured with carbon dioxide coming from the shipment in question and to withhold them from distribution to its customers. The number of these cases was 20,302. Thereafter, three representatives of the defendant Thermice, Messrs. Poffell, Davis, and Phillippi, came to the plaintiff's plant, observed the segregated cases, were given the opportunity of taste and sniff testing whatever bottles they selected, and removing whatever samples they wished for further inspection by defendant Thermice. Mr. Phillippi noted an unusual odor in the bottles inspected by him which he described as smelling bad and as a kind of a beer odor. He sniffed approximately a dozen bottles. Following this inspection, Mr. Phillippi agreed that the segregated cases should not be distributed and sold and that his company should pay for the cost of destruction. Laboratory testing of several sample bottles of Rock Creek's product manufactured with the $CO_2$ in question revealed that it had a beer odor and contained sulphur compounds.

On the basis of these facts, the Court finds for the plaintiff against the defendant Thermice. Thermice knew the nature of Rock Creek's business and that its product, carbon dioxide, was used by Rock Creek in the preparation of various soft drinks for human consumption. Being thoroughly aware of the importance of producing pure carbon dioxide used in the preparation of soft drinks expected to be used for human consumption, Thermice's expert witness, Mr. Martin Goldstein, testified to the elaborate quality controls maintained in Thermice's own plant. These quality controls, according to the testimony of Mr. Goldstein, were more extensive and impressive than those utilized by the third-party defendant Schaefer in purifying and testing the by-product, carbon

dioxide, in its manufacture of beer. Nevertheless, in this instance, Thermice elected to purchase Schaefer's surplus carbon dioxide for $10 a ton and distribute it to customers using $CO_2$ in the preparation of soft drinks for human consumption. It is noted that when Schaefer had need of additional $CO_2$ for its production of canned beer it paid Thermice $35 a ton for this ingredient. Thermice was given the opportunity of inspecting the means and methods employed by Schaefer in its product purification, testing, and storage of carbon dioxide, but nevertheless, did not avail itself of this opportunity, except to receive from Schaefer a cannister containing approximately three pounds of carbon dioxide which it tested in its own laboratory. No test by sniffing or otherwise was utilized by Thermice between acceptance of this carbon dioxide at Schaefer's plant and delivery to plaintiff with respect to this shipment.

Plaintiff's production cost for the 20,302 cases of its product manufactured with the impure $CO_2$, plus the cost of destroying them, is $41,841.55.

■ Defendant Thermice while denying liability pleads in the alternative that plaintiff was under the obligation to mitigate its damages and to shut down its production as soon as the unusual odor was detected. The Court finds plaintiff's efforts to ascertain the cause of the odor were prompt as well as reasonably extensive and that as soon as it was learned that the cause of the odor was one of the ingredients of the manufacture of its soft drink product, i. e., $CO_2$, production was promptly stopped and defendant Thermice notified.

■ Plaintiff is entitled to judgment in the amount of $41,841.55 against Thermice.

A more difficult question is presented by the third-party complaint and the course of dealing between Thermice and Schaefer. Thermice was well aware of the use to which the carbon dioxide it delivered to Rock Creek would be put. Schaefer, on the other hand, knew only that Thermice was in the business of distributing carbon dioxide manufactured by its parent corporation, Publicker, to a large number of customers engaged in the many uses of this product.

This course of dealing had its inception when Schaefer late in 1968 or early in 1969 decided to dispose of its surplus $CO_2$. The assignment was given to Mr. Agiato, Schaefer's senior buyer, who has the responsibility for sale of surplus by-products. Mr. Agiato got in touch with Schaefer $CO_2$ suppliers. Only Thermice expressed interest in purchasing this surplus $CO_2$. Early in 1969 Mr. Agiato met with Mr. Brocklehurst of Thermice. At that meeting they reached a general agreement for the purchase of $CO_2$ from Schaefer by Thermice. The terms agreed upon were price, availability, and the method of pick-up. While there was no direct representation by Schaefer as to the quality of its surplus $CO_2$, it is undisputed that Schaefer utilized its surplus $CO_2$ in connection with its beer brewing procedures, particularly in its beer canning operations, and representations were made that the amount of $CO_2$ available as surplus would depend upon Schaefer's own needs for utilizing this product in connection with its beer canning operations. Mr. Profido, engineer-manager of Schaefer's Baltimore Brewery, testified, that the standard $CO_2$ for its beer manufacturing processes was 99.9% purity but that 99.85% was acceptable. Rock Creek's acting plant manager testified that Rock Creek required $CO_2$ of at least 99.6% purity. While Mr. Agiato was not informed as to the ultimate use which Thermice expected to make of the $CO_2$ in question, he was aware that $CO_2$ is used in carbonated beverages.

Following a conversation in March of 1960 with Mr. Profido, Schaefer's Baltimore plant manager, Mr. Agiato again called Thermice and arranged a meeting of Messrs. Brocklehurst and Davis of Thermice with Mr. Profido in Baltimore. Following this meeting, Mr. Profido invited these men to visit Schaefer's plant and inspect the system. This

invitation they declined. It was agreed that a sample of Schaefer's surplus $CO_2$ would be made available to a Thermice representative from Schaefer's Baltimore facilities for testing purposes. This sample was analyzed by Thermice' chemist, Mr. Goldstein, who reported to Thermice that the sample was of satisfactory quality and odor free; actually testing a shade below 99.9% pure. He reported further that it could be used for most of Thermice's customers, including bottlers. Subsequently, Schaefer was advised that Thermice would commence pick-ups from the Baltimore brewery.

Following Mr. Goldstein's report to his company, Thermice and Schaefer entered into a course of dealings wherein Thermice's tank truck driver, Mr. Kenyon, at stated intervals went to Schaefer's Baltimore Brewery and obtained therefrom weekly tank loads of Schaefer's surplus $CO_2$. This course of dealing commenced in March of 1969 and continued through August 8, 1969. The amount of each pick-up ranged from about twenty thousand pounds to thirty-five thousand pounds. The total amount obtained by Thermice from Schaefer's Baltimore Brewery was 714,000 pounds.

On August 8, 1969, Thermice was notified of the discovery of the foul smell which emanated from the tank of $CO_2$ manufactured by Schaefer and delivered by Thermice to Rock Creek. Thermice promptly sent its representatives to Rock Creek's plant and, as heretofore reported, got samples of the material in question, as well as randomly selected bottles of Rock Creek's product manufactured with the $CO_2$ in question.

Shortly thereafter, Thermice notified Schaefer that there had been a problem with the $CO_2$ and that pick-ups of that material would be discontinued.

On these facts, the following third-party complaint issues are presented under various provisions of the Uniform Commercial Code, which is applicable both in the District of Columbia, Maryland, Pennsylvania, and New York:

1. Did Schaefer make an express warranty for the $CO_2$ which it sold Thermice?

2. Were the sales of $CO_2$ by Schaefer to Thermice subject to any implied warranties?

3. Was Schaefer given appropriate notice under the applicable provisions of the Uniform Commercial Code by Thermice?

I.

The first question presented is dealt with insofar as the facts of this case are concerned by Section 2–313(c) of the Uniform Commercial Code (Section 28:-2–313(c) of the D.C.Code):

(1) Express warranties by the seller are created as follows:

\* \* \* \* \* \*

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

It is noted that Schaefer does not contend that it made any disclaimers respecting the sample in question.

■ Official Comment accompanying this section is helpful in resolving the issue of express warranty. In pertinent part, Comment numbered 3 reads as follows:

In actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement. Rather, any fact which is to take such affirmations, once made, out of the agreement requires clear affirmative proof. The issue normally is one of fact.

The representation made by a reputable brewer of beer, the nation's fifth largest, that the surplus $CO_2$ in question is from time to time used by it in the man-

ufacture of *its own beer* is one which the buyer, Thermice, is entitled to rely upon as a matter of fact. The critical element in this course of dealings is the sample requested by Thermice and produced by Schaefer for testing in the Thermice laboratory by its chemist. It was of satisfactory quality and odor free. It was a shade under 99.9% pure and satisfactory for most of Thermice's customers, including bottlers. Mr. Profido, Schaefer's engineer-manager, testified that Schaefer's $CO_2$ standard for its beer manufacture was 99.9%, though 99.85% was acceptable.

The Court has earlier mentioned that there is no contention in this case of any disclaimer. In pertinent part Comment 4 reads as follows:

> In view of the principle that the whole purpose of the law of warranty is to determine what it is that the seller has in essence agreed to sell, the policy is adopted of those cases which refuse except in unusual circumstances to recognize a material deletion of the seller's obligation. Thus, a contract is normally a contract for a sale of something describable and described. A clause generally disclaiming "all warranties, express or implied" cannot reduce the seller's obligation with respect to such description and therefore cannot be given literal effect under Section 2–316.

It is noted that in one of the recent cases in the Third Circuit in which sale by sample was effected, Neville Chemical Company v. Union Carbide Corporation, 422 F.2d 1205, 1220 (1970), specific language was employed in an effort to avoid the binding aspects of a sale by sample and this effort was rejected both by the trial court and the Third Circuit.

In pertinent part, paragraph 5 of the Comments reads as follows:

> Past deliveries may set the description of quality, either expressly or impliedly by course of dealing. Of course, all descriptions by merchants must be read against the applicable trade usages with the general rules as to merchantability resolving any doubts.

Here, past deliveries aggregating over 700,000 pounds had been picked up by Thermice from Schaefer insofar as the evidence discloses. These past deliveries disclosed no deviation from the quality of the sample heretofore mentioned nor any objectionable odor which forms the basis of this lawsuit.

Third-party defendant Schaefer emphasizes that the bulk of its surplus $CO_2$ is constantly changing and that the sample supplied to the buyer could be deemed only a sample of the bulk from which it was drawn. This issue is discussed in Comment 6, which reads in pertinent part as follows:

> The question is whether the seller has so acted with reference to the sample as to make him responsible that the whole shall have at least the values shown by it. The circumstances aid in answering this question. If the sample has been drawn from an existing bulk, it must be regarded as describing values of the goods contracted for unless it is accompanied by an unmistakable denial of such responsibility.

Based on this Comment, the Court has no question but that the sample must be considered as describing the values of the goods contracted for unless there was a clear, convincing and unmistakable denial of such responsibility.

## II.

The second issue of law is whether the sales of $CO_2$ by Schaefer to Thermice are subject to any implied warranties. Section 2–314 (28:2–314, D.C.Code), reads in pertinent part as follows:

> (1) Unless excluded or modified (Section 28:2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

It is noted at the outset that the third-party action originally filed by Thermice

528

against Schaefer sounded only in express warranty. Shortly before the cause went to trial, Thermice filed a motion for leave to amend its complaint to assert in addition to express warranty, implied warranty. Under the liberal provisions and interpretations of Rule 14 of the Federal Rules of Civil Procedure, the Court permitted the amendment over the objection of Schaefer.

The difficulty with which Thermice is confronted in asserting implied warranty is contained in the language of the section "if the seller is a merchant with respect to goods of that kind." Comment 3 in pertinent part reads as follows:

A person making an isolated sale of goods is not a "merchant" within the meaning of the full scope of this section and, thus, no warranty of merchantability would apply.

Although here involved is the sale of a quantity of $CO_2$ in excess of 700,000 pounds, nevertheless, Schaefer contends strongly that it is a beer manufacturer and merchant, not a merchant of $CO_2$. On balance, the evidence on these points supports Schaefer's contention.

■ Opportunity to inspect the product in question which has been declined or not pursued precludes the existence of implied warranty, except as to a defect which would not be revealed upon a reasonably careful examination. Interstate Truck Service v. Pervo Paint Co., 236 Cal.App.2d 547, 46 Cal.Rptr. 182 (1965).

### III.

Was Schaefer given the type of notice by Thermice required by the Uniform Commercial Code? The applicable section according to Schaefer is Section 2–607 of the Code and particularly subparagraph 3(a), which reads as follows:

(3) Where a tender has been accepted

(a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; and
. . . .

The primary function of the section on which Schaefer relies is to require buyers who have accepted goods from sellers to notify those sellers within a reasonable time when the buyer contends that there has been a breach by the seller of the terms and conditions of the sale.

■ Here, the section is of questionable applicability because Thermice is neither seeking to return the goods, that is to say, the shipment of $CO_2$ from Schaefer which Rock Creek contends is defective, nor is Thermice seeking any rebate as a result of its defective condition. Following notification by Rock Creek, Thermice sent its truck to pick up the remaining portion of the $CO_2$ in question and deliver it to an industrial user of the product, namely, Armstrong Cork.

Assuming *arguendo* that the section does apply to such a transaction as is presented by the third-party complaint, it does appear from the testimony of Mr. Profido, Schaefer's engineer-manager, that Schaefer did receive information from Thermice as a result of which it learned shortly after Rock Creek had notified Thermice of the odor problem that pick-ups were being discontinued because there had been some problem with the $CO_2$ which would have to be resolved before there would be further need for any additional supply. Mr. Profido's testimony, as the Court recalls it, is not entirely clear on who made the call. Initially, he indicated that the call was made by a Mr. Crockett, who was one of Schaefer's foremen in Baltimore, to Thermice with respect to the pick-up by Thermice of the next load of Schaefer's $CO_2$, and then on being questioned further as to who made the call, he answered that Thermice had made the call and that Thermice had indicated that there would be no further pick-ups by Thermice from Schaefer's Baltimore Brewery until the problem that Thermice had encountered with the $CO_2$ had been resolved. From the context of the testimony with respect to weekly pick-ups, it appears that this information

was transmitted to Schaefer within a week of the time Thermice learned of the defective quality of the $CO_2$ in question. Such timing and notice would have been reasonable and in compliance with paragraph (3)(a) of Section 2–607 of the Uniform Commercial Code, as interpreted in Comment 4, the pertinent portion of which reads as follows:

> The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection (Section 2–605). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.

The Supreme Judicial Court of Massachusetts in Nugent v. Popular Markets, Inc., 353 Mass. 249, 228 N.E.2d 91 (1967), was concerned with the adequacy of notice under Section 2–607 of the Uniform Commercial Code. After quoting the portion of the Comment set forth above, the Court in *Nugent* set forth the facts as follows:

In that case, plaintiff contended that he had purchased in a self-service grocery a jar of boysenberries which he ate and which caused injury in that the jar of boysenberries *contained* foreign matter, i. e., a piece of wood. Notice was given to the store the following day. The Court pointed out that "it is manifest from the comment to the Code that the notice of breach required by § 2–607 was intended to be less rigorous than that required by § 38 of the Sales Act, at least so far as applied to a household

purchaser rather than a 'merchant buyer.'" Nugent v. Popular Markets, Inc., 353 Mass. 249, 228 N.E.2d 91, 94 (1967). The Court pointed out that the rule is only designed to defeat commercial bad faith "if the content of the notification need merely alert the seller to a claim of breach and so to lead to normal settlement through negotiation, after the receipt of the letter there would have been nothing to prevent the seller from seeking further information as to the date of the transaction and any other circumstances it wished to know." 228 N.E.2d at 94. Here, Schaefer could have gotten complete information from Thermice as to the situation encountered by Rock Creek stemming from the delivery of the $CO_2$ in question which had a smell described by one of the witnesses as that of a dirty bar rag, smelling like beer.

The Supreme Court of Minnesota in Moosebrugger v. McGraw-Edison Company, 284 Minn. 143, 170 N.W.2d 72 (1969), sustained a recovery for the plaintiff and in so doing, held that a letter by plaintiff to the seller advising the seller of difficulties encountered in the operation of the machines was sufficient compliance with the notice provisions of the Act. The Court relied upon Kopet v. Klein, 275 Minn. 525, 148 N.W.2d 385 (1967), and held that it was controlling on this point. Notice was given by the plaintiff two weeks after receipt of the water-softening device which "informed him of the difficulties he was experiencing with the device." Six months after direct notification of defendant and one year after installation, plaintiff's attorney advised defendant that the unit was not operating properly and it should be replaced or the purchase price refunded. The defendant contended that improper notice had been given and sought to avoid liability.

On these facts the Court concludes for the reasons stated that the third-party defendant Schaefer made a sale by sample which amounted to an express warranty and thereafter within a reasonable time of the discovery of the breach Schaefer received notice from

**530**

Thermice of the problem encountered as a result of which no further pick-ups of $CO_2$ would be made. Accordingly, the Court finds the third-party defendant Schaefer, the manufacturer of the defective $CO_2$ in question, responsible to the defendant and third-party plaintiff for damages incurred by Thermice, i. e., $41,841.55.

The foregoing memorandum opinion will constitute the Court's findings of fact and conclusions of law. Counsel will present an appropriate order.