# CIRCUIT COURT OF THE CITY OF NORFOLK

Bay Point Condominium
Association, Inc., et al.

    v.

RML Corp.
and Dryvit Systems, Inc.

    v.

Kemp Contracting, Inc., et al.

January 28, 2002

Case No. (Law) L99-475

BY JUDGE JOSEPH A. LEAFE

At the outset, the Court will address the issues arising from the Settlement, Assignment, and Release Agreement (hereinafter "Settlement Agreement") entered into pre-trial between the Plaintiffs Bay Point Condominium Association and the Board of Directors of the Bay Point Condominium Association (hereinafter "Plaintiffs"), Defendant RML Corporation, and Third-Party Defendant Kemp Contracting, Inc. In the Settlement Agreement, RML assigned Plaintiffs any and all rights RML has against Dryvit Systems, Inc., and Bishop Wall Systems, Inc. This Court entered a Consent Judgment Order on December 21, 2001, against RML in the amount of $4,000,000 after finding that the Settlement Agreement was reasonable. Prior to the end of the trial and in accordance with the Settlement Agreement, RML paid $1,400,000 to Plaintiffs.

Defendants object to the Settlement Agreement asserting that the Plaintiffs lacked standing to pursue RML's claims against Defendants. Specifically, Defendants argue that (1) "RML's implied contract indemnification claims were not assignable;" (2) "RML's purported assignment to Plaintiffs was invalid because it was revocable;" and (3) "RML's assignment to Plaintiffs was of no effect because RML suffered no loss for which it could be indemnified." (Defendants' Brief, pp. 3, 6, 7.)

RML's response argues generally that sufficient standing existed and specifically asserts that (1) "RML proceeded directly against Dryvit and Bishop;" (2) "RML's implied contract indemnification claims were assignable to Bay Point" because they were "causes of action for damage to personal property" and "causes of action *ex contractu*;" (3) "RML suffered a loss for which it could be indemnified;" and (4) "[t]he assignment by RML to Bay Point was not revocable." (Plaintiffs' Brief, pp. 4-7, 12-13.)

Defendants' first argument contends that Plaintiffs lacked standing to pursue RML's claims because under Virginia Code § 8.01-26, RML's claims were not assignable. Virginia Code § 8.01-26 states, in part: "[o]nly those causes of action for damage to real or personal property, whether such damage be direct or indirect, and causes of action ex contractu are assignable." Defendants correctly state that RML's claims were causes of action for the alleged breaches of the warranties of merchantability and fitness for a particular purpose, but maintain that neither action was for damage to real or personal property nor an action *ex contractu*, as required by statute.

This Court finds that Defendants' argument fails for two reasons: (1) RML proceeded directly against Dryvit and Bishop even though Plaintiffs' attorney prosecuted the claims and (2) the Virginia Supreme Court adopted the majority view that actions for implied warranties are actions *ex contractu*. *Wood v. Bass Pro Shops, Inc.*, 250 Va. 297, 462 S.E.2d 101 (1995). *See*

*Brockett v. Harrell Bros., Inc.*, 206 Va. 457, 153 S.E.2d 897 (1965) (citations omitted) (determining that contributory negligence is not a proper defense to an action for breach of the implied warranty of fitness because such an action is *ex contractu*).

Therefore, where RML proceeded directly against Defendants based upon claims of the implied warranties of merchantability and fitness for a particular purpose, this Court holds that RML had standing to proceed. Additionally, even if Plaintiffs did prosecute the claims as assignees of RML, Plaintiffs would have had standing to do so because warranty claims are considered *ex contractu* and are therefore assignable under Virginia Code § 8.01-26.

Next, Defendants contend that RML's assignment to Plaintiffs was revocable and therefore, invalid. Defendants correctly stated the law in this area: "to establish a valid assignment, the assignor must not retain any control over the fund or property assigned, any authority to collect the fund or property, or any form of revocation of the fund or property. Simply stated, if the assignor retains any control whatsoever over the fund or property to be assigned, then an assignment has not been effected." *Edmunds v. CBC Enters., Inc.*, 261 Va. 432, 437, 544 S.E.2d 324, 327 (2001) (citing *Kelly Health Care, Inc. v. Prudential Ins. Co. of Am., Inc.*, 226 Va. 376, 309 S.E.2d 305 (1983)).

In addition to the above statement, the Court noted that "[t]he intention of the assignor is the controlling consideration." *Kelly*, 226 Va. at 379, 309 S.E.2d at 307 (citing *Nusbaum and Co. v. Atlantic Realty*, 206 Va. 673, 681, 146 S.E.2d 205, 210 (1966)). "The intent to transfer a present ownership of the subject matter of the assignment to the assignee must be manifested by some word, written or oral, or by some act inconsistent with the assignor's remaining as owner." *Id.*

RML argues that the assignment was not revocable, and this Court adopts that position. The Settlement Agreement provides that the Plaintiffs had the option of declaring the agreement null and void but only if RML failed to pay $1,400,000 by November 25, 2001; the Settlement Agreement evidences RML's present intent to transfer their interest and ownership in the funds to Plaintiffs; and, contrary to Defendants' assertions, RML had no ability to revoke the assignment. Additionally, at this point in the case, the funds have been transferred to the Plaintiffs, the terms of the Settlement Agreement are satisfied, and the issue is moot. Therefore, based upon *Edmunds* and *Kelly*, this Court finds that RML's assignment to Plaintiffs was not revocable and, thus, valid.

Defendants also contend that, where RML suffered no loss for which it could be indemnified, the assignment to Plaintiff was ineffective. Defendants maintain that because Zurich, RML's insurer, made the settlement payment to

Plaintiffs, the assignment had no effect because RML suffered no loss. Plaintiffs argue that Zurich only paid for $1,400,000 of the $4,000,000 Consent Judgment and, therefore, RML has losses for which it can recover.

In the case of a partial subrogation by an insurer, either the subrogor-insurer or the subrogee-insured may sue another party liable for the loss; however, the subrogor-insurer is only a real party in interest to the extent of its payment to the insured. *See United States v. Aetna Sur. Co.*, 338 U.S. 366, 380-81 (1949); 16 *Couch on Insurance* 2d, § 61:4 (2d ed. 1983).

In a factually similar case, *VEPCO v. Westinghouse*, VEPCO claimed on behalf of itself and its insurer-subrogee damages resulting from the failure of its power station. 485 F.2d 78, 81 (4th Cir. 1973). The defendants argued that the insurer was the real party in interest due to its partial subrogation of VEPCO. *Id.* at 81. The court concluded that VEPCO could pursue the action for the entire loss claimed because VEPCO retained a significant interest in the litigation where the insurer only paid part of its entire loss, not the entire amount. *Id.* at 84. The court further stated that even though someone else might ultimately receive the entire proceeds of any recovery, VEPCO was entitled to enforce its rights. *Id.* at 84-85.

Furthermore, where there is partial subrogation, there are two real parties in interest. *Id.* at 84. Either party may bring suit, the insurer-subrogee, to the extent it has reimbursed the subrogor, or the subrogor for the entire loss or its unreimbursed loss. *Id.*; *see Traveler's Ins. Co. v. Riggs*, 671 F.2d 810, 813 (4th Cir. 1982) (stating that if the insured has a claim, it is a real party in interest in whose sole name the action may be prosecuted under general principles of subrogation).

Therefore, in the instant case, where RML had a $4,000,000 Consent Judgment entered against it and was subrogated by Zurich for a portion of that amount, RML, similar to VEPCO in the above case, is entitled to bring suit for its entire loss, even though any recovery from Defendants may ultimately go to someone else.

It is the conclusion of this Court that RML possessed sufficient standing to directly prosecute its implied warranty claims against Defendants and that RML's irrevocable assignment of its implied warranty claims to Plaintiffs was entirely proper, as causes of action *ex contractu*. This Court also finds that RML suffered a loss for which it is entitled to bring suit against Defendants for the entire amount of such loss, as evidenced by the Consent Judgment.

*Background and Facts*

The remainder of the instant matter came before the Court following a trial on the merits between RML and Defendants Dryvit and Bishop and upon the filing of Proposed Findings of Facts and Conclusions of Law submitted by counsel for all parties to the instant action.

This case was originally commenced by the Bay Point Condominium Assn., Inc., and the Board of Directors of the Bay Point Condominium Association against RML and Dryvit Systems for damages arising from alleged defects in the construction of the Spy Glass Condominiums at the Bay Point complex in Norfolk, Virginia (hereinafter "Spyglass"). RML, a Class A licensed general contractor in Virginia since 1975, served as the builder and developer of the Spyglass project. Dryvit Systems is a Rhode Island corporation that manufactured the Exterior Insulation Finish System (hereinafter "EIFS"),[1] also known as "synthetic stucco" and "Dryvit," that was utilized by RML as an exterior cladding on a large portion of the Spyglass project. In the Amended Motion for Judgment, Plaintiffs alleged that structural defects in the Spyglass project were due to interior and exterior wood decay, a direct result of the EIFS failing to allow foreseeable water intrusion to drain out of the EIFS clad walls at Spyglass.

In turn, RML filed a Third-party Motion for Judgment against Dryvit, the manufacturer of the EIFS used on the Spyglass project, Bishop, the Dryvit distributor who sold the EIFS to RML, Kemp, the subcontractor who installed the EIFS, and several other subcontractors and materialmen who were subsequently severed from the action by this Court.

On Dryvit's Motion for Summary Judgment, this Court dismissed Plaintiffs' direct action against Dryvit for the reasons set forth in this Court's March 30, 2001, Opinion. Plaintiffs' action against RML remained. Prior to trial, on October 29, 2001, Plaintiffs and RML and RML and Kemp entered into the Settlement Agreement in which RML assigned to Plaintiffs any and all rights RML had against Dryvit and Bishop. The Settlement Agreement left

---

[1] The EIFS system at issue in the present case is Dryvit's Outsulation. An EIFS barrier system, such as Outsulation, assumes that water will be shed from the exterior face of the building. Therefore, the Outsulation design attempted to seal the building and repel all water.

A cavity system, such as brick, wood, vinyl or aluminum siding, accommodates water that intrudes the exterior face of a structure through an evacuation mechanism. The Outsulation system provides no such mechanism for the evacuation of water that intrudes behind the system.

RML versus Dryvit and Bishop as the only remaining parties to the instant action.

On November 5, 2001, a bench trial commenced with Plaintiff's former counsel representing RML. The issues at trial were limited to RML's cross-claims against Dryvit and Bishop for breach of the implied warranties of merchantability and fitness for a particular purpose and the attendant damages for implied contractual indemnity. Final arguments were held on December 21, 2001, after the submission of the Proposed Findings of Fact and Conclusions of Law by both sides.

Prior to the conclusion of trial and in accordance with the terms of the Settlement Agreement, RML paid $1,400,000 to the Plaintiffs. Also on December 21, 2001, on the motion of the Plaintiffs, this Court entered a Consent Judgment Order against RML for $4,000,000.

RML, the Plaintiff in the instant action, is a builder and developer of single family and multi-family housing, including condominiums, in the Tidewater Virginia area. Robert Letchworth is the President of RML, which has held a Class A[3] contractor's license since 1975.

In 1995, in Norfolk, Virginia, RML began development and construction of the Spyglass portion of the Bay Point complex consisting of thirteen individual buildings, housing a total of sixty-one condominium units. Spyglass is surrounded on three sides by water — to the northeast by the Chesapeake Bay and to the east and south by Little Creek — and is subject to high winds and rain. RML began development of Spyglass by having a rough sketch of the layout of the property drawn. Then the type of plans that are typically used in the Tidewater area for construction of multi-family condominiums were prepared by an architect, Mr. Heimbach.

From 1986 through 1999, George Kemp, the owner of Kemp and a drywall and plastering contractor, was an EIFS contractor that applied Dryvit's Outsulation EIFS for all of the large builders in the Tidewater area. As an EIFS applicator, Kemp employed subcontractors to install and apply the EIFS. In the mid 1980s Mr. Kemp learned by on-the-job training how to apply EIFS from Jay Horton, an EIFS applicator and former Kemp employee (hereinafter "Horton"), whom Mr. Kemp understood attended a Dryvit training school. Mr. Kemp never received any formal training from Dryvit on

---

[3] Va. Code § 54.1-1100 (2001) *Definitions*: " 'Class A contractors' perform or manage construction, removal, repair, or improvements when (i) the total value referred to in a single contract or project is $70,000 or more, or (ii) the total value of all such construction, removal, repair, or improvements undertaken by such person within any twelve-month period is $500,000 or more."

how to apply EIFS and none of Kemp's subcontractors, other than Horton, were trained by Dryvit on how to apply EIFS. Notwithstanding the lack of formal training, Kemp was declared a certified Dryvit applicator and a certificate was issued in the name of Kemp Contracting, Inc. Kemp was first certified by Dryvit during the time that Horton worked for Kemp and was thereafter certified annually by Dryvit through Bishop without Kemp having to do anything to obtain the certificates.

Kemp recommended that RML use Dryvit EIFS on the Spyglass project and thought that Outsulation was suitable for use at Spyglass.

Bishop was the Dryvit distributor during the time Kemp installed Dryvit EIFS in the Tidewater area. Jim Bishop visited some of Kemp's projects and observed Kemp's installation of Outsulation without expressing any concern to Kemp about the method used to apply Outsulation.

Kemp's application of Outsulation started with plywood or OSB substrate or sheathing to which Kemp applied foam insulation board with a glue such as Dryvit's Adeps, purchased from Bishop, and used mechanical fasteners to adhere the insulation to the substrate. After the foam was applied, it was rasped, a base coat was applied, mesh was run into the base coat and then the finish coat was applied. Prior to 1996, Kemp installed a backer rod and then caulked the wood window and finish coat. Kemp utilized a Dow Corning caulking, as it was used by Horton when he began his employment with Kemp. At no time was Kemp ever informed by Dryvit or Bishop that they were using the wrong type of caulk. At Spyglass, all of the components of Dryvit's EIFS, including adhesive, foam, mesh, base coat, and the finish coat were purchased from Bishop by RML.

In 1996, after Spyglass buildings 11, 12, and 13 were completed, the Tidewater Builders Association (hereinafter the "TBA") conducted a training program in conjunction with the Exterior Insulation Manufacturer Association (hereinafter "EIMA"). Attendance at the class was made mandatory by Virginia Beach Inspections in order to continue applying EIFS in Virginia Beach, Virginia. Attendance was not made mandatory by the Norfolk Building Inspections Department.

EIMA representatives were present at this training program which discussed the moisture intrusion and resulting damage that was occurring with EIFS.[4] The program focused on how to prevent the damage, including new types of caulking systems, the necessity of caulking the base coat instead of the finish coat, and the importance of kick-out flashings and a watertight

---

[4] It was not clear whether any of the EIMA representatives were from Dryvit, although Dryvit was active in the industry and offered no denial.

seal on the building. Kemp attended the training program and received a certificate for attendance.

Kemp received no information regarding water intrusion or water entrapment due to Outsulation prior to the Spyglass project even though Dryvit was, at the time, aware of the major concerns surrounding the Outsulation system.

The Virginia Uniform Statewide Building Code (hereinafter the "Virginia Building Code") incorporates the BOCA code and has a specific section that deals with traditional claddings. EIFS, which is not mentioned in the Virginia Building Code, is treated as alternative material. BOCA issued Research Reports on Outsulation utilizing information and details provided by Dryvit, specifically including the design of joints between Outsulation and dissimilar materials and the use of flashings. Local code officials used these Research Reports in deciding whether or not to allow Outsulation to be used in Virginia.

The Virginia Building Code contains performance requirements, one of which is that a cladding is required to exclude water from a building's interior. Dryvit's Outsulation fails to conform to this basic performance requirement and, thus, is not in compliance with Virginia's Building Code.

Prior to beginning construction, RML chose brick and Dryvit's Outsulation EIFS to clad the buildings at Spyglass so that the exterior would be maintenance-free. Kemp was selected to apply the Outsulation because RML knew that Kemp was an experienced subcontractor and certified applicator of EIFS. RML obtained a bid for a "turn-key" job from Kemp to apply the Outsulation, sealant, and kick-out flashings to the exterior of the Spyglass units. RML and Kemp then fashioned an oral agreement for the EIFS to be placed on the Spyglass buildings based upon Kemp's quoted price for labor and materials of approximately $32,000 per five-unit building and approximately $28,000 per four-unit building.

Before any Outsulation was installed on the Spyglass units, Letchworth met with Jim Bishop, the Dryvit distributor, and George Kemp at the Spyglass job site. Letchworth expressed concern about the use of the EIFS at Spyglass and wanted to make sure that the EIFS would hold up in the coastal environment, with northern exposure, that the Spyglass units would be situated within. Based upon the meeting and the assurances of Bishop and Kemp, Letchworth felt assured that the Dryvit EIFS would perform with no problems at Spyglass. Bishop did not testify and no evidence was offered to the contrary.

Kemp, Bishop, and RML then entered into a joint payment agreement in reference to the purchase and application of Dryvit Outsulation. Kemp invoiced RML approximately $400,000 for the cost of labor and materials to

install Outsulation at Spyglass. Pursuant to the joint payment agreement, RML issued checks for $129,181 directly to Bishop for the Dryvit system materials that were subsequently installed and applied onto the Spyglass units by Kemp. Kemp was also directly paid approximately $271,000 for labor and other materials necessary for the installation of Dryvit's Outsulation system at Spyglass. The "turn-key" oral agreement between RML and Kemp indicated that Kemp ordered the Dryvit materials used and required Kemp to caulk the EIFS. Kemp supplied the backer rod and kick-out flashings[5] and applied them where needed. Kemp also picked up the Dryvit materials from Bishop and delivered these materials to the Spyglass site.

RML had no experience as an applicator or installer of EIFS, thus RML relied upon Kemp, as a certified applicator, for the correct installation of the Outsulation, backer rods, caulking, and kick-out flashings at Spyglass. At the appropriate time, after framing and rough-in, Kemp applied Dryvit Outsulation to three exterior sides of each Spyglass unit. Brick was applied to the front of the Spyglass units, in the typical manner for this area.

From 1995 when construction began on Spyglass until 1998 when construction was completed, Spyglass was routinely inspected by RML, the site superintendents. In addition, the City of Norfolk Building Inspector inspected the Spyglass project and RML received final inspection approval from the Norfolk Building Inspections Department and certificates of occupancy for each of the thirteen buildings constructed at the Spyglass complex.

Soon after Kemp completed the Outsulation application on the first building at Spyglass, water intrusion was detected. Kemp assured RML that the intrusion was coming from the windows and doors and was not due to the caulking. Kemp removed a portion of the EIFS from below a window at the condominium of Mr. and Mrs. Starkey and found moisture damage below the window. Kemp repaired the damage, reapplied the Outsulation, and re-caulked the area. Subsequently, following northeasters and normal rainfall, RML received complaints from Spyglass condominium owners about leakage around the windows and sliding glass doors. RML attempted to stop the leaks, but even after changing to a different window and door distributor, RML was unable to stop all the leaks regardless of the measures taken.

At the time of the Spyglass construction, residential windows were known to leak into an Outsulation EIFS clad structure when installed according to standard workmanship practices and according to Dryvit's

---

[5] Kickout flashings are used to divert rainfall so that it cannot penetrate the exterior wall.

instructions and details. While not perfect, the application and installation of the Outsulation, windows, doors, decks, and flashings at Spyglass was consistent with standards in this area. During the time period of the Spyglass construction, Dryvit did not have, but should have had, details for a contractor or applicator to follow in regards to common and foreseeable points of water intrusion, i.e., windows, doors, kickouts, and decks. These common sources of water intrusion and Outsulation system failures were known to Dryvit since the 1980s[6] and yet, the product remained substantially unchanged through the 1990s, despite the pervasive problems. These failures were reinforced to Dryvit in the form of several hundred residential structures in Wilmington, N.C., which suffered from water intrusion resulting from the same type of situation found at Spyglass.

RML presented to this Court, Mark Williams, a nationally recognized expert in EIFS. Williams is a registered architect who has reviewed over 2500 EIFS projects in 48 states. This Court finds his testimony informative and persuasive.

Williams proved to this Court that an effective cladding requires a successful relationship between three key elements: (1) design; (2) materials; and (3) application process. This Court finds that each of these three elements, in relation to Dryvit's Outsulation, individually fails in its material purpose and, when combined, fails to create a successful system.

Outsulation's "Design" element is defective and conceptually flawed because the design assumes all water is shed at the exterior face of the structure, even though water intrusion is foreseeable. The Outsulation design details fail to provide for the collection and redirection of foreseeable water that intrudes behind the cladding; instead, Outsulation traps water behind the cladding. Where the Virginia Building Code performance requirements state that a cladding is required to exclude water from a building's interior, Dryvit's Outsulation system, by design, violates the Code and is inconsistent with standard residential construction means and methods. This Court finds that Outsulation fails to meet the standard of what an exterior cladding should do and what Dryvit represented it would do.

---

[6] Testimony and Dryvit internal memoranda proved that, in 1984, Bob Thomas, an engineer in Dryvit's Technical Department, identified that the Outsulation system had a water intrusion problems and recommended to Dryvit's executives that the design of Outsulation's barrier system be changed. Another Dryvit engineer, Dick Hopkins, identified specific water intrusion sources, similar to the water intrusion sources at Spyglass.

Outsulation's "Materials" element is flawed due to foreseeable and inevitable water intrusion that occurs with exterior claddings. Outsulation materials are essentially plastic, a material with low permeability, and when these materials are used as Dryvit intended, water has difficulty in getting out of the wall from behind the EIFS material. The water thus becomes trapped behind the Outsulation, causing structural damage to the building it was placed upon. Water trapped behind the Outsulation barrier can only escape via evaporation, and because of the low permeability of the essentially plastic Outsulation system, evaporation is significantly impeded as compared to the drying capabilities of a traditional cladding system.

Outsulation's "Application" element is also flawed. The Outsulation system requires specialized knowledge and training to install; however, Dryvit assigned the training to its distributors, such as Bishop. The distributors' training of Outsulation installers was inadequate, at best, and the distributors failed to train all affected trades. Dryvit's process requires trades to apply details that cannot work and fails to address details related to common and foreseeable points of water intrusion, despite Dryvit's and its distributors' knowledge of a history of water intrusion at these points. Dryvit's specifications and instructions call for generic flashings; however, when these flashing were applied at Spyglass according to the typical means and methods of construction, the flashings were incompatible with the Outsulation product.

This incongruence between the flashings and the Outsulation resulted in a foreseeable water intrusion into the Spyglass structures and, as a consequence, water was trapped behind the Outsulation, resulting in structural damage to the buildings. If Outsulation contained an evacuation or redirection system, the foreseeable water intrusion would not have been trapped behind the EIFS cladding at Spyglass and would not have caused the Spyglass units structural damage.

Interestingly, Dryvit's Infinity system, which was launched prior to the beginning of the Spyglass construction, addressed most, if not all, of the problems that were caused by Outsulation. Infinity provides for the evacuation of water from behind the EIFS material, improved upon the application process, required third-party inspections of the installation and application, and consisted of better and more appropriate materials. Dryvit's Infinity patents acknowledge that water intrusion was foreseeable and addressed the need to provide a mechanism that can evacuate the intruding water from the EIFS-clad structure.

It was shown that, prior to the problems that presented at Spyglass, Outsulation was met with great objection within the construction trade and that Dryvit possessed the knowledge, at the time of the Spyglass construction,

to cure the defects in Outsulation. Prior to Infinity's introduction into the marketplace, Williams discussed with Dryvit representatives the continuing problems with water intrusion, failures in application, and inadequate applicator training. Before construction began at Spyglass, Dryvit admitted the problems with water intrusion in regard to barrier systems, such as Outsulation, during the development, launch, and marketing of their new product, Infinity. In early 1993, in a letter from Dryvit executive Vincent Tamburrini to Dr. Kudder, Mr. Tamburrini stated: "We continue to feel that the basic EIFS barrier wall concept is valid, but we recognize the opportunity for inadvertent water entry when an EIFS cladding is designed with many openings such as doors, windows, air conditioning units, etc." Dryvit also admitted that it was impossible for all water to be shed at the exterior face of an Outsulation-clad structure.

Based in part upon the testimony of RML's expert, Dr. Tage C. G. Carlson, it is obvious to this Court that the pervasive water damage in residential structures clad with Outsulation is primarily due to the defective design of the Outsulation system and the lack of details. Dryvit failed to perform field trials, mock-up testing, or any hands-on evaluation that tested the entire Outsulation system or Outsulations' interaction with other materials required to form the complete residential housing envelope.

The nature and extent of the damage caused by the Outsulation system failure was well established by the testimony of David May and Ron Wright. Mr. May, a local architect with the TAF Group in Virginia Beach, Virginia, performed tests on the Spyglass condominiums. May extracted sixteen sample squares from a variety of locations on the exterior of the Spyglass condominiums. As a result of the samples taken at Spyglass, May discovered severe water intrusion and rotted sheathing and studs behind the Outsulation EIFS. May also discovered insect infestation, ants, mold, mildew, slugs, and termites behind some of the samples. Upon taking the samples, May encountered some areas where upon the initial penetration of the Outsulation for the sample, a stream of water poured out of the perforation.

May also took samples from where the EIFS abuts the brick façade on the front of each condominium. None of these samples evidenced any water intrusion. The water that intruded into the EIFS in these area was able to evacuate out due to its proximity to the brick façade.

Additionally, Mr. Wright took 1343 moisture readings using a direct contact moisture meter consisting of two probes that penetrate the EIFS to read the moisture content of the wood behind the EIFS. Wood has a natural moisture content of approximately 19 percent. Moisture content readings between 20 percent and 30 percent indicate that water has intruded behind the EIFS, readings of 30 percent or greater indicate fiber saturation of the wood

and damage to the sheathing. At Spyglass, 52 percent (701) of the readings indicated a moisture content 20 percent or greater and 39 percent (528) of the readings evidenced a moisture content of 30 percent or greater. These readings reinforce the extent and seriousness of the water intrusion.

Dr. Kudder, Dryvit's expert witness, wrote in the early 1990s "performance records of these systems also reveals some disadvantages and avoidable failures. Problems with EIFS result from misapplication, unreasonable expectations, material incompatibilities, poor detailing, and incomplete integration of EIFS components with other façade elements. Part of the problem results from incomplete and overly simplistic guidelines published by manufacturers. ..." Kudder also admitted during testimony that "the design professional must rely on the manufacturer and suppliers for guidance for the development of details and the dissemination of necessary technical information." Moreover, Dryvit employee I. J. Valainis' testimony reveals that Dryvit never did any tests to evaluate Dryvit's compatibility with other building components, like windows and doors.

From the evidence presented, it is clear to this Court that Dryvit's Outsulation EIFS system was defective when purchased by RML. Dryvit failed to plan and design their Outsulation system for the occasion of foreseeable water intrusion behind the cladding resulting from points of penetration in the Outsulation, regardless of the impact of the other obvious construction defects. This Court finds that the Outsulation system would be defective even if installed completely according to Dryvit's specifications, details, and instructions due to its failure to accommodate inevitable and foreseeable water intrusion.

Based upon the evidence elicited at trial, this Court makes the following conclusions of law.

Virginia Code § 8.2-314, *Implied Warranty of Merchantability*, states in pertinent part:

> (1) [A] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.
> (2) Goods to be merchantable must be at least such as
>     (a) pass without objection in the trade under the contract description; and ...
>     (b) are fit for the ordinary purposes for which such goods are used.

The first issue is whether a contract existed for the sale of the Outsulation from Defendants to RML. A contract for the sale of goods can be found in an

in-fact agreement between the parties or implied from the surrounding circumstances, such as a course of dealing, a usage of trade, or a course of performance between the parties.

> An implied contract is one not created or evidenced by the explicit agreement of the parties, but inferred by the law, as a matter or reason and justice from their acts or conduct, the circumstances surrounding the transaction making it a reasonable, or even necessary, assumption that a contract existed between them by tacit understanding.

*Black's Law Dictionary* (7th ed. 1999).

In the instant case, this Court determines that an implied contract can be inferred as being formed by RML and the Defendants as a result of Bishop's sale of Dryvit Outsulation to RML. It would defy reason to conclude that a contract was not formed based simply upon the fact that Kemp picked up and applied the purchased system. The circumstances surrounding this transaction require this Court find that a contract existed, particularly where Bishop was a distributor of a Dryvit's proprietary product in this area, Bishop met with RML at the Spyglass site prior to construction began, a joint payment agreement was executed by RML, Bishop, and Kemp, and where RML made direct payments to Bishop for the Outsulation which was adhered to the buildings that RML, at that time, owned.

Therefore, based on § 8.2-314, out of this implied contract for the sale of the Outsulation, an implied warranty arose guaranteeing that the Outsulation was merchantable, provided the other elements of the statute were satisfied. This concept is firmly entrenched in Virginia law. Prior to Virginia's adoption of the Uniform Commercial Code (U.C.C.), in 1961, the Virginia Supreme Court in *Smith v. Hensley* utilized the following principle in determining that an implied warranty arose when Smith, like RML, purchased a product sold under its "patent or trade name." 202 Va. 700, 703-04, 119 S.E.2d 332, 334-35 (1961).

46 Am. Jur., *Sales*, § 344, states:

> *Goods Sold under Exact Description or under Patent or Trade Name.* While there is some authority to the contrary, the view expressed in the great majority of the cases passing on the point is that in a sale of an article under an exact description or under its patent or other trade name, there is a warranty of merchantability or of fitness for the ordinary or general purposes of goods so described, and the fact that an article is sold under an exact description or under

its patent or other trade name does not preclude such a warranty at common law or under the Uniform Sales Act, which provides for such a warranty upon a sale by description by a seller dealing in goods of that description, although in a subsequent clause it is provided that in case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose. In other words, an implied warranty of merchantability is not excluded by such subsequent clause. These rules apply to a sale under a trade term which by use has become generic.

*Id.*

Later adoption of the U.C.C. did not change the rationale and logic adopted by the Supreme Court. Therefore, based upon the reasoning in *Smith*, this Court determines that upon the sale of Outsulation, the patented trade name of Dryvit's barrier EIFS, to RML by Bishop, an implied warranty of merchantability arose.

Furthermore, Virginia's anti-privity statute allows RML to proceed based upon implied warranty claims arising from the sale from Bishop to RML without there being a need for this Court to determine whether or not there was contractual privity between the parties.

Virginia Code § 8.2-318 states: ·

Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer or seller of goods to recover damages for breach of warranty, express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant. If the plaintiff was a person whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods. ...

This entire subject was addressed in this Court's Opinions of July 18, 2000, and January 30, 2001.

Privity of contract is not required to bring a claim in a breach of implied warranty case. The Virginia Supreme Court held that privity is only required in an implied warranty case where the parties are seeking recovery of consequential damages based on the implied contractual indemnity which

arises from the breach of the implied warranty. *See Beard Plumbing and Heating, Inc. v. Thompson Plastics, Inc.*, 254 Va. 240, 491 S.E.2d 731 (1997).

Based upon the anti-privity statute, the lack of privity that exists between RML and Defendants is of no consequence to the instant action where RML can not seek consequential damages, if RML was a person whom Defendants "might reasonably have expected to use, consume, or be affected by the goods." It is patently obvious to this Court that Dryvit, a manufacturer of a building product and Bishop, the distributor of that product, could anticipate that RML, a builder, was a person reasonably expected to use, consume, or be affected by Outsulation.

The next sub-issue arising from RML's implied warranty claim is whether Outsulation constitutes a "good." Until this point in the instant case, this Court has not determined whether the Outsulation sold to RML did or did not constitute a "good" within the meaning of § 8.2-314. Defendants argue that RML cannot state a claim based upon the implied warranty of merchantability because EIFS is not a good, where this Court held that building materials cannot constitute "goods." Defendants, however, misrepresent the substance of this Court's March 30, 2001, Letter Opinion. In regard to the Spyglass owner's claims, this Court's Opinion stated that the owner Plaintiffs did not have a cause of action based upon the implied warranties because once the EIFS was incorporated into realty it could no longer be considered a good. The Opinion furthered stated, however, that the EIFS was a good at one time. The time this Court was referring to was when RML purchased the Outsulation from Bishop. Therefore, as related to the instant claims, this Court fully recognizes that the Outsulation system at issue constituted a good during the times relevant to this case.

A good is wholly defined as "all things (including specially manufactured goods) which are moveable at the time of identification to the contract for sale. ..." Va. Code § 8.2-105(1) (2001). The "goods" must be "existing and identified" before any interest in them passes to the buyer. *Id.* at (2). "In the absence of explicit agreement, identification occurs (a) when the contract is made. ..." Va. Code § 8.2-501(a) (2001).

In the instant case, at the time the Outsulation EIFS was sold to RML, it was identified to the implied sales contract between RML and Bishop, the Outsulation was "existing" and identifiable to that contract, and the Outsulation was moveable; thus, it constituted a good.

This Court rejects Defendants' argument that the Outsulation EIFS was merely an "intangible concept" that could not constitute a good. Dryvit developed, marketed, and sold, under a patent, the component part Outsulation system. The system, as sold, consisted of materials that when

combined with the patented method of assembly, intentionally resulted in an exterior wall cladding. The patented Outsulation method of application and system components, the "goods" in this case, thus carried with them a manufacturer's warranty that, while not applicable to remote plaintiffs, are applicable to the direct purchaser, RML.

Nor did the implied warranties RML received upon purchasing the Outsulation simply disappear when the goods it contracted for were incorporated into realty. An implied warranty of merchantability arises, if at all, at the time the product is sold to the purchaser. *Goodbar v. Whitehead Bros.*, 591 F. Supp. 552, 567 (W.D. Va. 1984), *aff'd sub nom. Beale v. Hardy*, 769 F.2d 213 (4th Cir. 1985). While the original Plaintiffs who purchased completed condo units had no direct warranty claim against Dryvit, the warranty that arose when the goods were sold to RML remain with RML. Contrary to Defendants' argument, the damages suffered by RML were not caused by realty, but rather by the goods that Defendants developed, patented, marketed, and sold as Outsulation.

This Court must then consider whether Defendants fit within the definition of a "merchant" as mentioned in Virginia Code § 8.2-314. A "merchant" is:

> [A] person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

Va. Code § 8.2-104(1) (2001).

In the instant case, both Defendants, Dryvit and Bishop, deal in Outsulation. Dryvit is a manufacturer with a patented product and, therefore, Dryvit intrinsically holds itself out as having particular knowledge of Outsulation. Bishop is the "other intermediary" who, as a distributor of Dryvit's EIFS, is held out by Dryvit and holds itself out as having knowledge and skill related to Outsulation. This Court concludes that both Defendants should be considered "merchants" within the meaning of § 8.2-314. Therefore, where RML was determined to have purchased the Outsulation, a sale of the Outsulation was made by a "merchant" dealing in goods of that kind.

Virginia Code § 8.2-314 provides that in all sales of goods by a merchant, a warranty is implied that the goods will be merchantable. The burden is on the complaining party to prove that the goods were not merchantable.

*Bayliner Marine Corp. v. Crow*, 257 Va. 121, 128, 509 S.E.2d 499, 503 (1999). Merchantable goods are those goods that "pass without objection in the trade" and are "fit for the ordinary purposes for which such goods are used." Va. Code § 8.2-314 at (2)(a), (c). "Pass without objection" refers to whether or not a "significant segment of the buying public" would object to purchasing the goods. *Bayliner*, 257 Va. at 128, 509 S.E.2d at 503. "Fit for the ordinary purposes" concerns whether goods are "reasonably capable of performing their ordinary functions." *Id.*

The record in the instant case is replete with evidence showing that Dryvit's Outsulation did not pass without objection in the trade and that Outsulation was not fit for its ordinary purpose at the time it was sold to RML, or for that matter, at any time at all.

It is obvious to this Court that Outsulation does not pass without objection in the trade. RML presented several experts to prove this point, and it is evident from the testimony elicited at trial that Outsulation has many vehement opponents within the architectural, design, and building communities. These communities constitute a large segment of the advising and purchasing public for building materials such as Outsulation and, thus, reasonably constitute the "buying public" as noted in the statute.

The testimony elicited at trial also established that an acceptable exterior cladding must be sufficiently durable so as to shed water from the face and exclude water from the interior of a building structure. Unlike Outsulation, well-known and highly tested materials such as brick, hardi-plank, and molded vinyl routinely demonstrate the ability to divert or drain water that inevitably intrudes through common points of intrusion or are of a nature that allows the water to evaporate through the material. This point is driven home even further by the sample and moisture testing evidence showing that there was no damage to the wood structures behind the EIFS adjacent to the brick façade at Spyglass.

This Court notes with interest the samples taken from the Spyglass buildings by May. From an inspection of the samples that were taken from various portions of the buildings, including areas close to common points of water intrusion and those away from these point, it is obvious that the water that was trapped behind the Outsulation caused the extensive rotting of the wood structure covered by Outsulation and invited the infestations of insects, mold, and mildew. The 1343 moisture readings that were introduced also provide substantial corroboration for the contention that the buildings at Spyglass contain a high percentage of rotting wood due to the failure of the Outsulation.

The evidence adduced at trial made it clear that there were no accommodations made, or redundancies built-in, for the inevitable water

intrusion that would occur behind Outsulation, even though Dryvit acknowledged Outsulation's problems with water intrusion years prior to Spyglass's construction. As stated by Dr. Robert Kudder, Defendants' witness, "[t]he exterior wall has to function as a barrier, otherwise it is not doing its job as a wall." (Transcript, November 13, 2001, p. 21.) Therefore, Outsulation by not being able to function as a barrier, fails as an acceptable wall system.

Another Dryvit witness, Michael Chenney testified that any time a crack, tiny hole, or any intrusion in the Outsulation appears, it would have to be properly sealed in order to keep out water. (Transcript, November 13, 2001, pp. 136-38.) Outsulation is not merchantable when it is marketed as "maintenance-free cladding" but requires the filling of every hole and crack on a regular basis to keep out water.

This Court finds that Outsulation is not fit for its ordinary purpose because it did not provide the alleged barrier to water intrusion and, as a consequence, trapped water behind the system; it did not provide a means to drain or divert water that intruded behind the "barrier" system; it failed to provide accurate specifications, instructions, and details for common points of water intrusion; and, because Dryvit abandoned any type of training program, it failed to properly train applicators, all while still "certifying" them to apply Outsulation.

This Court remains unpersuaded that the incorrect installation of the Outsulation and admitted shoddy construction at Spyglass constitute misuse of the product, caused the failure of the Outsulation system or even mitigates Defendants' responsibility in the instant matter. Defendants failed to maintain a training and certification program even though certifications for applicators were issued on a yearly basis. Defendants also failed to provide critical and necessary details, specifications, and instructions regarding Outsulation, common points of water intrusion, and information on how to integrate the Outsulation with other building components.

While the Court finds that the installation complied with the general standards in the trade, even if the Outsulation were perfectly applied according to Dryvit's specifications, instructions, and details, the patented Outsulation "system," consisting of the method of application and the component parts, is intrinsically defective and, thus, is not merchantable. The representations made by Defendants in relation to the Outsulation product cannot, under any circumstances, be fulfilled. Outsulation is far from maintenance-free and is not suitable for use on wood-framed residential construction.

Therefore, this Court finds that the sale of the Outsulation to RML by Defendants resulted in an implied warranty of merchantability, that this

implied warranty was breached when the sale occurred because the Outsulation was not merchantable, and that the unmerchantability of the Outsulation was the proximate cause of the direct damages suffered by RML.

Virginia Code § 8.2-315, *Implied Warranty: Fitness for Particular Purpose*, states:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill and judgment to select or furnish suitable goods, there is unless excluded or modified under the next section [§ 8.2-316] an implied warranty that the goods shall be fit for such purpose.

Dryvit contends that RML must fail in its claim for the implied warranty of fitness for a particular purpose because RML did not communicate a purpose to Dryvit or Bishop or rely on them in selecting Outsulation.

When a buyer orders goods to be supplied for a particular purpose and that purpose is communicated to the seller and the buyer then relies upon the judgment or experience of the seller to select applicable and suitable goods for that particular purpose, an implied warranty of fitness for a particular purpose arises. *Carney v. Sears, Roebuck & Co.*, 309 F.2d 300, 303 (4th Cir. 1962). Furthermore, if a "manufacturer or dealer contracts to supply an article which he manufactures or produces, or in which he deals, to be applied to a particular purpose, so that the buyer necessarily trust to the judgment or skill of the manufacturer or dealer, there is an implied term of warranty that it shall be reasonably fit for the purpose to which it is to be applied. ..." *Universal Motor Co. v. Snow*, 149 Va. 690, 697, 140 S.E. 653, 655 (1927).

It is true that, if a product is used for its ordinary purpose, then the sale of the product does not create an implied warranty of fitness for a particular purpose. *See Lescs v. Dow Chem. Co.*, 976 F. Supp. 393, 401 (W.D. Va. 1997). The "particular purpose" of a product differs from the ordinary purpose innate in the Implied Warranty of Merchantability because a "particular purpose" conceives a use by the buyer that is particular to the nature of his business and an "ordinary purpose" refers to those purposes in which a good is used in a manner customary to goods of that nature. Virginia Code § 8.2-315, cmt. 2 (2001).

In the instant case, the Outsulation at issue was not being used just for its ordinary purpose. RML supplied sufficient evidence allowing this Court to conclude that the ordinary purpose of Dryvit's Outsulation is to serve as an exterior barrier cladding on building structures. Dryvit promoted Outsulation's use on various types of building structures, without delineating

the type of structures for which it was or was not suitable, and Dryvit intended for Outsulation to be used on commercial and residential structures alike and, thus, this constitutes its "ordinary purpose."

This Court finds that Outsulation's particular purpose, in this case, was to serve as an exterior barrier cladding on wood-framed multi-family residential construction because this is the use that was particular to the nature of RML's business. Therefore, in order for RML to recover damages under § 8.2-315, RML must prove (1) Defendants had reason to know the particular purpose for which RML required the goods, (2) Defendants had reason to know RML was relying on the Defendants' skill or judgment to furnish appropriate goods, and (3) RML in fact relied upon the Defendants' skill or judgment. *Beard Plumbing and Heating, Inc. v. Thompson Plastics, Inc.*, 152 F.3d 313, 317 (4th Cir. 1998) (quoting *Medcom, Inc. v. Weaver*, 232 Va. 80, 348 S.E.2d 243 (1986)); *see also Bayliner*, 257 Va. at 129; 509 S.E.2d at 129. Whether there "was an implied warranty of fitness for a particular purpose in a sale of goods is generally a question of fact based upon the circumstances surrounding the transaction." *Bayliner*, 257 Va. at 129, 509 S.E.2d at 129.

The Official Comment to the statute states, however, that a buyer is not required to specifically import to the seller actual knowledge of the particular purpose for which the good is intended or show his reliance on the seller's skill or judgment as long as the seller has reason to know the intended purpose or the buyer can show that the reliance existed. Va. Code § 8.2-315, cmt. (1) (2001). This Court finds that both Defendants had reason to know the intended particular purpose for which RML required the Outsulation. It is uncontroverted that Dryvit placed Outsulation into the distribution cycle and promoted Outsulation for application on wood-framed residential construction in coastal areas. Furthermore, it is clear that RML selected this product because it was distributed and promoted as being suitable for this type of construction and the Tidewater environment. These facts alone show that Dryvit intended that Outsulation be used for RML's particular purpose, application on wood-framed residential construction, and thus Dryvit had reason to know the "particular purpose for which RML required the goods." *See Beard*, 152 F.3d at 317.

Furthermore, by not delineating that Outsulation was not fit for use on wood frame residential construction in a coastal setting versus steel frame commercial or wood frame inland construction, Defendants impliedly warranted that it was fit for such use. This implied warranty flies in the face of the knowledge that Dryvit possessed regarding the failure of Outsulation in such environments. In 1995, Dryvit inspected approximately 150 homes in the Wilmington, N.C., area for moisture intrusion into substrate materials after being notified of the problem by the Building Department of New

Hanover County, North Carolina. Dryvit's inspection detected substantial evidence of abundant wood rot behind the EIFS. This occurred prior to the beginning of Spyglass construction and, thus, shows that Dryvit was informed of the repeated failures of Outsulation on wood-framed residential coastal construction.

Bishop's knowledge of RML's particular purpose is even clearer. Bishop visited the Spyglass construction site and stated no objections to the proposed use of Outsulation on the Spyglass project. This evidence shows that Bishop was well aware of RML's particular intended use of the Outsulation product.

As discussed above in regard to the Implied Warranty of Merchantability, Outsulation utterly failed as an effective exterior cladding on wood frame residential coastal construction. Thus, this Court finds that, based upon the evidence adduced at trial, where Defendants' knew of RML's particular intended purpose and where Outsulation was unfit for the particular purpose of serving as an effective exterior barrier system on wood frame residential construction in a coastal zone, that Defendants breached the implied warranty of fitness for a particular purpose at the time of the sale of the Outsulation to RML.

The next question is whether or not Defendants were notified of the breach of the implied warranties in accordance with Virginia Code § 8.2-607(3)(a). Defendants contend that RML had the burden of proving that Defendants were notified of the breach within a "reasonable time" prior to the filing of the lawsuit.

Virginia Code § 8.2-607(3)(a) states: "Where a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."

In the case at bar, RML was the buyer in a sale of goods transaction in which Bishop was the merchant seller. RML then re-sold the Outsulation, once incorporated into realty, to the original Plaintiffs. Plaintiffs instituted the instant suit against RML and Dryvit in the spring of 1999. Shortly thereafter, in July of 1999, RML filed a cross-claim against Dryvit and in September of 1999, filed a Third-Party Motion for Judgment against Bishop. Most of the case law addressing this topic deals with situations where the buyer of the good institutes suit against the immediate seller or remote manufacturer for a breach of a warranty. It appears that no Virginia Supreme Court case addresses the factual situation present in the instant case, a defendant buyer instituting a cross-claim and third-party claim against an immediate seller and a remote manufacturer after being sued for a breach of warranty by a non-buyer plaintiff.

However, in *Begley v. Jeep*, the Western District of Virginia addressed a similar issue involving a car manufacturer that instituted third-party complaints against two manufacturers of component parts after being sued by the buyer plaintiff. 491 F. Supp. 63 (W.D. Va. 1980). In *Begley*, the plaintiff brought suit in April of 1976 against Jeep and others for negligence and breach of warranty due to the failure of the Jeep braking system that resulted in plaintiff's injuries. *Id.* at 64. Then, in September 1978, the defendants filed third-party complaints for indemnification and contribution against Bendix Corporation and Wagner Electric,[8] alleging breach of warranty. *Id.*

Bendix and Wagner claimed, under Virginia Code § 8.2-607(3)(a) that Jeep failed to give them timely notice of the breach of warranty claim asserted by Plaintiff, where Jeep waited over two years from receipt of the plaintiff's complaint to give defendants notice of the breach. The Court denied Jeep's actions against them, holding that defendants were denied (1) the opportunity to fully investigate the claim in a timely manner; (2) the ability to participate in meaningful settlement negotiations; and (3) the opportunity to depose potential witnesses in a timely manner. *Id.*

In the instant case, Defendants argue that RML failed to give them notice of the breach of warranty claims. From Defendants' argument, it appears they assert that RML failed to give them notice of the cross-claim and third-party breach of warranty claims prior to the filing of the instant matter. Unlike *Begley*, the time lapse in the instant case was one to three months. This Court determines that this delay in no way prejudiced the Defendants.

The *Begley* court also suggested that a discovery of a breach of warranty occurs when the plaintiff recognizes that the defendant's products were involved in the breach and that a warranty claim could be asserted against them. *Cole v. Keller Industries, Inc.*, 872 F. Supp. 1470, 1474 (E.D. Va. 1994) (citing *Begley*, 491 F. Supp. at 66).

In the instant case, the original Plaintiffs cannot be considered the buyers of the Outsulation, since as discussed in previous opinions, the Outsulation was not a good at the time Plaintiffs purchased their condominium units. RML, as the buyer of the Outsulation, is then the party required by § 8.2-607(3)(a) to give reasonable notice of a breach of warranty claim to Bishop, the seller of the Outsulation. RML is not required by § 8.2-607(3)(a) to give notice of the warranty claim to Dryvit because Dryvit was not the seller in the instant transaction. *See* Va. Code § 8.2-607(3)(a); *see also Kerr v. Hunter Div. and Electrical Equip. Co.*, 32 Va. Cir. 497, 502-03 (Henrico

---

[8] Bendix was the manufacturer of the braking system, and Wagner manufactured the brake fluid for the Jeep.

1981). In any event, Dryvit was sued at the same time as RML and had the same notice of the original homeowner suit.

Defendants state that the only notice received regarding the warranty claims was from the service of the Third-Party Motion for Judgment and RML's cross-claim against Dryvit and argue that this does not constitute adequate notice within the parameters of Virginia Code § 8.2-607(3)(a).

It is true that some courts have found that service of process is insufficient notice of a breach of warranty claim. *See, e.g., Armco Steel Corp. v. Isaacson Structural Steel Co.*, 611 P.2d 507, 513 (Ala. 1980) (filing of a third-party complaint by defendant one year into the litigation); *Lynx, Inc. v. Ordnance Prods., Inc.*, 327 A.2d 502, 514 (Md. 1974) (holding that, if no notice was given prior to the institution of an action, a condition precedent to the right to bring the action does not exist and the buyer-plaintiff has lost the right of his "remedy"); *Voboril v. Namco Leisure World, Inc.*, 24 UCC Rep. Serv. 614 (Conn. Super. Ct. 1978) ("A finding that service of a complaint is sufficient notice would impede the purposes of the notice requirement."). However, these cases are factually different from *Begley* and the case at bar, because, in those distinguishable cases the original plaintiff was the immediate buyer, not the defendant and third-party plaintiff as in *Begley* and the instant case.

In the instant case, RML was originally a named defendant and did not learn of the breach of warranty claim until it was sued by the original Plaintiffs. Therefore, it can reasonably be said that not until RML was sued did it recognize that the Defendants' products were involved in a breach of warranty claim and it was not until this time that RML could assert a warranty claim against the Defendants. Until RML was sued by Plaintiffs, it had no such warranty claim of which to notify Defendants. Instituting a Cross-Claim and a Third-Party Motion for Judgment within three months of acquiring a breach of warranty claim in order to notify Defendants of RML's claim of breach of the implied warranties was not unreasonable under the instant circumstances.

The notice requirement of § 8.2-607(3)(a) is noted to serve several ends, namely to clear the path for "normal settlement through negotiations." *See Begley*, 491 F. Supp. at 65. Notice also "allows the seller to attempt to cure the problem" or gives them an "opportunity to prepare for litigation." *Id.* (citing White & Summers, *Uniform Commercial Code*, 344 (1972)). In *Cole v. Keller Industries, Inc.*, the court noted that two of the policy reasons for this rule are to (1) protect sellers from stale claims and (2) allow "sellers sufficient time to prepare for litigation by investigating and collecting potential evidence." 872 F. Supp. at 1474. Moreover, the court in *Rock Creek Ginger Ale Co. v. Thermice Corp.* determined that the primary function of

U.C.C. § 206-7(3)(a) is to "require buyers who have accepted goods from sellers to notify sellers within a reasonable time when the buyer contends that there has been a breach by the seller of the terms and conditions of the sale." 352 F. Supp. 522 (D. D.C. 1971). The court noted Comment 4 to § 2-607(3)(a) of the U.C.C.:

> The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejections (Section 2-605). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.

*Id.*

The court held that the issue of reasonable notice is a jury question unless the facts are undisputed and no other inference can be drawn as to the reasonableness and timeliness of notice." *Id.* "[R]easonable time for taking any action depends upon the nature, purpose, and circumstances of such action." *Id.* (quoting Va. Code § 8.2-204(2)).

Based upon the nature, purpose, and circumstances of the instant action, this Court finds that testimony and evidence prove that the notice provided to Bishop of RML's breach of warranty claim was reasonable in light of the circumstances, even when notice was given to Bishop in the form of a Third-Party Motion for Judgment, particularly where the converse of the above stated U.C.C. Comment means that there is also no bar to using a claim for damages as notification. The Official Comment also states that the notification only need inform the seller that the transaction involves a breach, and this Court holds that this is exactly the function of a Motion for Judgment. At the point in the instant litigation when the cross-claim and Third-Party Motion for Judgment were filed, the sending of a "notice" of the breach to Bishop and Dryvit would have served no purpose because litigation was already initiated concerning the transaction and none of the policy concerns surrounding the giving of notice were even remotely applicable. Thus, RML's quickly filed pleadings served to notice Defendants that RML determined that the transaction constituted a breach.

Furthermore, RML's Motions for Judgment gave Bishop and Dryvit time and opportunity to prepare for litigation, to investigate and collect potential evidence, and to enter into settlement negotiations. A three month delay in the filing of the Third-Party Motion for Judgment from RML's discovery of a breach of warranty claim is not unreasonable given the circumstances of the instant case, particularly when the purposes of the notice requirement, as stated above, were served by service of the Third-Party Motion for Judgment. Moreover, Dryvit was already on notice of Plaintiffs' claims for breach of the implied warranties and was not prejudiced by RML's subsequent filing of the same claims in order protect itself from being held solely liable for Dryvit's defective product.

Virginia Code § 8.2-725 reads, in pertinent part: "A cause of action for breach of implied warranty accrues when tender of delivery of the goods is made." Under a strict reading of the statute, RML's cause of action therefore accrued upon "tender of delivery" of the Outsulation by Bishop. This Court finds that based upon the evidence, the "tender of delivery" of the Outsulation occurred when all of the Outsulation, as contemplated by the implied contract, was delivered for installation on the Spyglass condominium units. Therefore, RML's cause of action for breach of the implied warranties did not accrue until after September 18, 2000, and thus, RML's Third-Party Motion for Judgment was timely filed.

Additionally, it is important to note that "[t]he implied warranty of merchantability that generally arises upon the sale (or delivery) of goods and the implied contract of indemnity that is derived from the breach of warranty are distinctly different and are governed by different statutes of limitation. *Wingo v. Norfolk & W. Ry.*, 638 F. Supp. 107, 112 (W.D. Va. 1986), *rev'd on other grounds*, 834 F.2d 375 (4th Cir. 1987). This opinion is maintained by Anderson in his treatise on the U.C.C. which states:

> When the plaintiff seeks to recover from the defendant manufacturer the payment which the plaintiff had made to a third person injured by the product made by the defendant, the action is one for indemnity and this is not altered by the fact that the plaintiff entitles his action as one for breach of warranty.

R. Anderson, *Anderson on the Uniform Commercial Code*, § 2-314.15 at 124 (3d ed. 1983).

Therefore, the more important issue before this Court is when the cause of action accrued, not the length of the period of the statute of limitations. Courts differ in their determinations of when a cause of action accrues in an indemnity action; some courts link the accrual of the action for indemnity to

the original plaintiff's injury; other link it to the indemnitee's injury. Anderson, *supra* (citing *Rambone v. Critzer*, 548 F. Supp. 600 (W.D. Va. 1982); *Smith-Moore Body Co. v. Heil Co.*, 603 F. Supp. 354 (E.D. Va. 1985); *Walker Manufacturing Co. v. Dickerson, Inc.*, 619 F.2d 305 (4th Cir. 1980); *Jones v. Meat Packers Equipment Co.*, No. 81-871-n (E.D. Va. July 5, 1984); *Nationwide Mutual Ins. Co. v. Jewel Tea Co.*, 202 Va. 527, 118 S.E.2d 646 (1961)).

The Fourth Circuit in *Walker Manufacturing* held that a claim for indemnity based upon a breach of an implied warranty was not barred when the original action instituted by the plaintiff was time-barred. 619 F.2d at 308-09. This was expanded on in *Gemco-Ware, Inc. v. Rongene Mold & Plastics Corp.*, where the issue was whether a two-year statute of limitations barred the defendant, timely sued by the plaintiff, from initiating a third-party action for contribution and/or indemnification against a potential defendant, not sued by the plaintiffs, after the statute expired. 234 Va. 54, 55, 360 S.E.2d 342, 343 (1987). The Virginia Supreme Court held that a cause of action and a right of action in contribution do not arise at the same time; finding that the right to contribution arises and the statute begins to run upon payment or discharge of the "common obligation." *Id.* at 57-58, 360 S.E.2d at 343-44.

Accordingly, the accrual of a cause of action for indemnity is best linked to the time when the indemnitee was injured, rather than when the original plaintiff was injured. In the instant case, RML was injured when it made payment to the original Plaintiffs in settlement of the claims asserted against it. The fact that RML instituted cross-claims and a third-party claim prior to its incurring actual injury is of no consequence. *See* Va. Code § 8.01-281(A) (2001) (stating that a cross-claim or third-party claim "may be based on future potential liability" and it is "no defense thereto that the party asserting such claim, counterclaim, cross-claim, or third-party claim has made no payment or otherwise discharged any claim as to him arising out of the transaction or occurrence.").

Therefore, in the instant case, this Court finds that while RML's cause of action for breach of warranty accrued upon the completion of delivery of the entire contemplated amount of Outsulation to the Spyglass site, RML's right of action did not accrue until it made payment to Plaintiffs in satisfaction of the Settlement Agreement and Consent Judgment Order. For this Court to hold otherwise would, in essence, contemplate that the statute of limitations could have run out even before RML was damaged, "before the cause of action ripened into a right of action." *See Stone v. Ethan Allen, Inc.*, 232 Va. 365, 370, 350 S.E.2d 629, 632 (1986) (quoting *First Va. Bank-Colonial v. Baker*, 225 Va. 72, 83, 301 S.E.2d 8, 14 (1983)). This would be an unjust and inequitable result that is not within the purpose of the statute of limitations.

*Id.* Statutes of limitations are "designed to compel the prompt assertion of an accrued right of action" not to serve as a bar to a right that has not yet accrued. *Id.* (citing *Caudill v. Wise Rambler*, 210 Va. 11, 13, 168 S.E.2d 257, 259 (1969)).

Consequently, under either of the above grounds of analysis, this Court determines that RML's Third-Party Motion for Judgment was timely filed.

Where this Court determines that Defendants breached the implied warranties of merchantability and fitness for a particular purpose in regard to the sale of Outsulation to RML, RML is entitled to recover the direct damages it sustained as a result of the breach.

A buyer's measure of damages for breach in regard to accepted goods is found in Virginia Code § 8.2-714:

> (1) Where the buyer has accepted goods and given notification (subsection (3) of § 8.2-607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
>
> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
>
> (3) In a proper case any incidental and consequential damages under the next section [§ 8.2-715] may also be recovered.

*Id.* (emphasis added).

The Virginia Supreme Court in *Roanoke Hosp. Ass'n v. Doyle & Russell, Inc.*, 215 Va. 796, 801, 214 S.E.2d 155, 160 (1975), held that:

> [t]here are two broad categories of damages ex contractu: direct (or general) damages and consequential (or special) damages. Direct damages are those which arise "naturally" or "ordinarily" from a breach of contract; they are damages which, in the ordinary course of human experience, can be expected to result from a breach. Consequential damages are those which arise from the intervention of "special circumstances" not ordinarily predictable. If damages are determined to be direct, they are compensable. If damages are determined to be consequential, they are compensable only if it is determined that the special circumstances were within the "contemplation" of both contracting parties. Whether damages are

direct or consequential is a question of law. Whether special circumstances were within the contemplation of the parties is a question of fact.

*See also Blue Stone Land Co. v. Neff,* 259 Va. 273, 277-78, 526 S.E.2d 517, 518-19 (2000); *Long v. Abbruzzetti,* 254 Va. 122, 126-27, 487 S.E.2d 217, 219 (1997); *NAJLA Assocs. v. William L. Griffith & Co. of Va.,* 253 Va. 83, 86-87, 480 S.E.2d 492, 494 (1997); *R. K. Chevrolet, Inc. v. Hayden,* 253 Va. 50, 56, 480 S.E.2d 477, 481 (1997).

In *Roanoke Hosp.,* suit was initiated due to a contractor's delay in completion of the hospital and the hospital sought damages due to rising interest costs due to the delay, rising interest costs due to an increase in interest rates, and increased interest cost resulting from an increase in the hospital's permanent financing. *Id.* at 802, 214 S.E.2d at 158. The Court held that the increased interest costs that arose from the increasing interest rates during the delay and increased costs due to the increase in permanent financing constituted non-compensable consequential damages. *Id.* at 802-03, 214 S.E.2d at 160-61. However, the Court found that the increased interest costs arising from the delay constituted compensable direct damages because they were "predictable results of the delay." *Id.*

In *Blue Stone,* the parties contracted for the construction of a street to provide access to land so that it could be developed. 259 Va. at 278, 526 S.E.2d at 517. Defendant failed to complete the road within a reasonable period of time, and Blue Stone alleged that the contract was breached. The Court stated that where the defendant breached the contract, it should have expected that Blue Stone would, "in the ordinary course of human experience," construct an alternative means of access to the property. *Id.* at 278, 526 S.E.2d at 519. Therefore, the Court held that the costs of constructing a contracted for, but uncompleted, street constituted direct damages because they arose naturally and ordinarily from the breach of contract. *Id.* Additionally, the Court in *Sensenbrenner v. Rust* held that "[t]he effect of the failure of substandard parts to meet a bargained-for level of quality was to cause a diminution in the value of the whole, measured by the cost of repair." 236 Va. 419, 425, 374 S.E.2d 55, 58 (1988).

This Court previously held that, if a breach of warranty was proven, RML would be entitled only to direct economic damages for the losses resulting from Defendants' breach. Thus, based upon the case law, the direct damages sustained by RML are those that naturally and ordinarily arose from a breach of the implied warranties inherent in the sale of the Outsulation. Therefore, the question that must be answered at this point in the case is what constitutes RML's compensable direct damages?

Defendants argue that direct damages are only measured by the difference between the value of goods as warranted and the value of goods provided. However, this recitation of the law ignores the plain statement of Virginia Code § 8.2-714(2). The "nonconformity" referred to in subsection (1) of the above statute includes that which arises from the breach of a warranty and allows the buyer to recover for the loss "in any manner which is reasonable." *Id.* at U.C.C. cmt. 2. It is noted that while subsection (2) describes the "usual, standard, and reasonable method of ascertaining damages" as the "difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted ..." it is not the exclusive measure in a breach of warranty case. *Id.* at U.C.C. cmt. 3. Under Virginia law, the buyer of the product is entitled to be put in a position it would have been if the contract was fulfilled rather than the position it would have been in had the contract never been formed. *Fournier Furniture, Inc. v. Walz-Holst Blow Pipe Co.*, 980 F. Supp. 187, 191 (W.D. Va. 1997). Furthermore, direct damages are continually found to constitute the cost of repairs. *See Bruce Farms*, 219 Va. at 293; *accord Appalachian Power Co. v. John Stewart Walker, Inc.*, 214 Va. 524, 535-36, 201 S.E.2d 758, 767 (1974); *see also Roanoke Hosp.*, 215 Va. at 802, 214 S.E.2d at 160; *Genito Glen, L.P. v. National Housing Bldg. Corp.*, 50 Va. Cir. 71 (Virginia Beach 1999) (Padrick, J.).

Based on the above stated law, RML's direct damages are therefore to be measured as the cost of repairing the Spyglass units, due to the damage caused by the defective Outsulation system, because the cost of repairing the damage arises naturally and ordinarily from the breach of the implied warranties.

May was the only witness presented that provided this Court with an estimate of the repair costs for the damage that occurred at Spyglass due to the Outsulation failure. Defendants failed to present any evidence contradicting May's testimony, and this Court concludes that Defendants do not dispute the cost estimates.

May's estimates assessed the cost of fully repairing the Spyglass structures. May testified that there were three viable repair and re-cladding options for the Spyglass units: (1) brick; (2) hardi-plank; and (3) molded vinyl. All of the estimates included the stripping of Outsulation off the exterior of the Spyglass units, and, after calculating the full cost of repairs for the condominium units, including those repairs for damages not attributable to the defective Outsulation system, May's estimated costs were (1) brick: $5,185,000; (2) hardi-plank: $3,225,000; and (3) molded-vinyl: $3,323,000. After May "zeroed-out" those costs not associated with damage that occurred as a result of the defective Outsulation, the figures were revised as follows:

(1) brick: $3,044,000; (2) hardi-plank: $1,360,000; and (3) molded vinyl: $1,486,000.[9]

This Court finds that, due to the damages caused by the defective Outsulation, these amounts are reasonable under the circumstances of this case, notwithstanding Defendants' arguments that RML contributed to the damage caused by the Outsulation. This Court determines that the damage caused by the defective Outsulation installed at the Spyglass units would have occurred regardless of RML's other deficiencies in the construction of the units. The Spyglass units were not built to perfection, but this Court finds that they were constructed of a quality and in a manner consistent with other builders in this area. Regardless of the builder, same or similar damages would have occurred to the units due to the defective Outsulation system.

It is also this Court's finding that the brick re-cladding testified to by May is the closest approximation for reasonable repair of the Spyglass units. May's brick re-cladding estimate was corroborated as reasonable by Dryvit's expert, Michael Chenney. Chenney testified that the cost of Outsulation and brick is approximately the same amount, $6.50 per square foot. Thus, using May's 2001 Cost Summary for the direct cost of brick re-cladding and repair of the associated damages is an appropriate way to measure damages.

This Court finds that RML is entitled to direct damages based upon implied contractual indemnity from Defendants' breach of the implied warranties of merchantability and fitness for a particular purpose in the amount of $2,544,000. This sum represents the direct cost of repair and re-cladding of the Spyglass units with brick, $3,044,000, as testified to by May, minus the $500,000 paid to RML by Kemp for its role in the installation of the defective Outsulation system. Kemp only installed the Outsulation on this project, and, thus, its full payment must be applied to the cost of replacing the Outsulation regardless of how the proceeds were allocated in the settlement agreement.

---

[9] The Court notes that the re-cladding estimates are based upon the same costs for the underlying associated damage repairs; the cost estimate differential is due to the differences in the square foot cost of each of the viable re-cladding alternatives.